MISSOURI, K. & T. RY. CO. OF TEXAS v. LUTEN et al. (No. 7961.)

(Court of Civil Appeals of Texas. Dallas. May 4, 1918. Rehearing Denied June 1, 1918.)

1. RAILROADS ⏤369(2) — HIGHWAY CROSSINGS—SIGNALS.

The omission of the statutory signals on approach of a train to a highway crossing is negligence per se only in cases of those using or about to use the highway, and not with respect to trespassers.

2. RAILROADS ⏤400(1) — CROSSING ACCIDENTS—QUESTIONS FOR JURY.

In an action for the death of plaintiff's decedent through being struck by a railroad train, evidence *held* not, as a matter of law, to show that deceased was a trespasser, and not at the public crossing when struck.

3. TRIAL ⏤142 — DIRECTION OF VERDICT — SUFFICIENCY OF EVIDENCE.

To authorize the court to take a material issue from the jury, the evidence must be of such a character that there is no room for ordinary minds to differ as to conclusion to be drawn from it.

4. RAILROADS ⏤316(4) — CROSSING ACCIDENTS—NEGLIGENT SPEED.

In an action for the death of plaintiff's decedent through being struck by a train at a crossing, negligence might be predicated on the speed of the train, although the place of the accident was in the country, and there was no statute regulating the speed; it being the duty of defendant to exercise ordinary care in regard thereto.

5. RAILROADS ⏤350(7) — CROSSING ACCIDENTS—QUESTIONS OF FACTS.

In an action for the death of plaintiff's decedent through being struck by a railroad train at a public crossing, evidence *held* to make a question for the jury as to whether statutory crossing signals were given.

6. RAILROADS ⏤350(33) — CROSSING ACCIDENTS — QUESTIONS OF FACT—DISCOVERED PERIL.

In an action for the death of plaintiff's decedent through being struck by defendant's train at a public crossing, whether defendants did all in their power to avoid the accident after observing deceased *held*, under the evidence, for the jury.

7. TRIAL ⏤253(4) — CROSSING ACCIDENTS — INSTRUCTIONS.

In an action for the death of plaintiff's decedent through being struck by defendant's train, it was not error to refuse a special charge that, unless the jury believed that decedent was struck while upon the road crossing, they could not find for plaintiff; such instruction ignoring the issue of discovered peril, and requiring a finding for defendant, unless decedent was at the crossing when struck.

8. RAILROADS ⏤401(1) — CROSSING ACCIDENTS—INSTRUCTIONS.

In an action for the death of plaintiff's decedent from being struck by defendant's train, an instruction that the law requires those in charge of railroad trains to use great care and prudence in operating them, so as to avoid injury to others, and if by the want of such care injury is inflicted upon others, without fault of themselves, the company would be liable, was not erroneous, as being misleading.

Appeal from District Court, Hill County; Horton B. Porter, Judge.

Action by Mrs. E. E. Luten and others against the Missouri, Kansas & Texas Rail-

---

way Company of Texas to recover for wrongful death. Judgment for plaintiffs, and defendant appeals. Affirmed.

A. H. McKnight, of Dallas, W. E. Spell, of Waco, and Collins, Morrow & Morrow, of Hillsboro, for appellant. Wear & Frazier, of Hillsboro, for appellees.

TALBOT, J. This is the second appeal of this case. 184 S. W. 798. The suit was instituted by Mrs. E. E. Luten, for herself and as next friend for her four minor children, to recover of appellant damages sustained on account of the death of her husband, and the father of said children, E. E. Luten, who it is alleged was killed on April 1, 1914, as a result of being negligently struck by one of appellant's trains at a public dirt road crossing. The acts of negligence charged and which were submitted to the jury as issues of fact, are: (1) That appellant's servants in charge of the train negligently ran it, in approaching and passing over the crossing, at a dangerous rate of speed; and (2) that said servants in charge of said train negligently failed to blow the whistle or ring the bell of the engine in approaching the crossing as required by law. It is also charged, in effect, that appellant's servants in charge of said train saw E. E. Luten, the deceased, on appellant's railroad track and, after realizing his danger from the approaching train operated by them, negligently failed to use the means at their command to stop the train and avoid striking the deceased, but, on the contrary, negligently ran said train against him, and inflicted the wounds which resulted in his death.

The appellant answered, specifically denying that the dirt road crossing, where it is alleged that the deceased was struck and killed, was a public road crossing, or one commonly and habitually used by the public as such. Appellant also denied that it was guilty of any of the acts of negligence charged, and alleged that the injuries received by the deceased on the day in question resulted from his own negligence and carelessness, in that he was a trespasser upon defendant's railroad track at the time of the accident, using it as a footpath; that he was extremely deaf, which was unknown to appellant until after the accident, but known to all of the members of his family; that deceased had been warned by his family and friends that his conduct in trespassing upon the track of appellant would sooner or later result in his death, but that, notwithstanding such warning, he continued to use the same as a footpath. Appellant further answered by saying that, when its servants operating the engine which struck the deceased discovered that the deceased was upon its track, they immediately rang the bell, and kept it ringing until the deceased was struck, and blew the whistle of the engine, giving what is known as the stock alarm whistle, which is two

long and two short blasts; that the deceased appeared to have heard the said alarm signals given, as he veered from about the center of the track to near the east rail of the track, and appellant's servants believed that he was leaving the track; that at the very moment they discovered he was continuing northward on the track, and did not intend to leave it, they did everything in their power with the means at their command to reduce the speed of the train, stop the same, and prevent the striking of the said Luten. A jury trial resulted in a verdict and judgment in favor of appellees for $6,000. From this judgment the appellant perfected an appeal.

The first assignment of error complains of the trial court's refusal to give a special charge, requested by appellant, directing the jury to return a verdict in its favor. The proposition advanced under the assignment is as follows:

"Where, as here, the evidence as a matter of law is insufficient to support a judgment in favor of plaintiff, it is the duty of the trial court, especially upon request, to instruct a verdict for the defendant."

The appellant, under this assignment and proposition, sets out the testimony at length and argues that it shows conclusively that it was through no fault or negligence of its servants that E. E. Luten lost his life; that it discloses beyond dispute that the deceased, Luten, was not struck by the train while he was in the act of passing over the dirt road crossing, but at a point 200 or 300 feet north of this crossing and while a trespasser upon appellant's property, and after the operatives of the train had done all they possibly could do, by the use of the means at their command, to stop the train and avoid striking Mr. Luten after discovering his perilous position; that if, by any possible construction of the testimony, it can be said that the deceased, Luten, was struck by the train while he was attempting to pass over appellant's railroad track at the dirt road crossing, said testimony further shows beyond controversy that appellant's servants in charge of said train gave the statutory signals in approaching said crossing, and was in no manner whatever guilty of negligence which proximately caused the accident and death of the said Luten.

We make the following findings and statement of the testimony:

The deceased lived west of the appellant's railroad and about 400 yards northwest of the crossing in question. A short time before the accident causing his death he left home, carrying a shotgun. The railroad, where it intersects the dirt road leading from the deceased's house, runs practically north and south, and the dirt road practically east and west. At this intersection of said roads the railway company had constructed, and maintained for many years prior to the death of the deceased, Luten,

the crossing in question, and the same had been commonly and habitually used by the public for travel during all those years. About 9 o'clock of the morning the deceased left home with his gun, a train operated by the appellant's servants passed over the road crossing going north. At this time two reports of a gun at or near the crossing were heard by some of the witnesses who testified in the case, and immediately thereafter a train whistle, giving two short blasts, was heard at or about the same point, and the train stopped immediately thereafter. In perhaps an hour, or less time, after this, the body of the deceased, Luten, was found at the estimated distance, according to testimony offered by appellees, of 40 or 50 feet north of the crossing and about 15 feet east of the railroad track. When found, Mr. Luten was dead, his gun broken, and both barrels had been discharged. There was a wound on his right side, below the arm and shoulder blade. The right leg was broken. The wound on the leg was on the right side of the leg. The deceased's hat was found on the ground about 15 feet north of the crossing and on the east side of the railroad bed. About 30 feet north from the crossing, on the east side of track, some letters belonging to the deceased were also found. There was also near this place where blood was found an indentation in the ground at the end of the cross-ties, as if some object had struck there. There was another such place about 70 feet from the crossing and 16 feet east of the railroad track, and there was blood on the weeds there.

H. B. Idaho, an undertaker, testified that he embalmed the body of the deceased after removing the clothing and washing it. He said the deceased "had one wound on the right side, under the right arm; it was an incision like wound; looked like it was torn in the body, right smart sized wound"; that he found another wound on the right side of the head near the temple; that the right leg was broken, and that the wound on the right leg was on the right side of the leg. The railroad bed or dump at the crossing was about 10 feet high and on the morning of the accident there was a very dense fog. Mrs. Luten heard the noise of the train as it passed, but on account of the fog could not see the train. The deceased was a sober, industrious farmer. His hearing was defective, but, if spoken to in a loud tone of voice close to him, a conversation could be carried on with him. His wife, Mrs. Luten, said: "He could hear a train blowing."

The engineer operating the engine drawing the train on the morning of the accident testified that he had been familiar with the crossing in question for about 17 years; that as he approached said crossing on the morning E. E. Luten was killed he sounded the road crossing whistle and rang the bell; that he saw a man on the track, who he afterwards learned was Mr. E. E. Luten; that when he first saw him he was 150 or 200 yards ahead of the engine; that it was very foggy when he approached the crossing; that when he first saw Mr. Luten on the track he could not tell that he was a man, could just tell that an object was on the track; that when he sounded the whistle he veered to the right of the track, and he thought he was going to get off, but did not do so; that when the deceased did not get off the track he began the stock alarm whistle and put on the emergency brakes and opened the sand box; that when he first saw the deceased the train was running 40 miles an hour, and that when the engine struck him it was running about 20 or 25 miles an hour; that when he began the stock alarm whistle the engine was something like 100 yards from the deceased, but that the deceased did not seem to notice it and continued up the track. He further said the deceased was struck just north of, and about 200 or 300 feet from, the crossing; that he did all he possibly could to stop the train, after he saw that the deceased did not leave the track, to avoid striking him; that when the train struck the deceased he heard a report that sounded like the report of a gun. This witness further stated that the average speed of the train was 28 miles an hour, but that to make that average they had to run faster between stops and stations. On cross-examination this witness testified that, when approaching the point where the Dallas and Waco road crosses appellant's railroad, which was about a half mile south of the crossing at which it is claimed the deceased was struck, he gave the usual crossing signals; that after that crossing was passed he "cut the bell off," and it was started again after he blew the whistle for the man he saw on the track; that "when I first blew the whistle I was about 150 yards from him [the deceased], and I was about that far from him when I could tell it was a man"; that when he saw the object on the track, and blew the whistle, he must have been just south of the crossing in question a few yards; that he could not tell just how far, but it was either a short distance south of it, or about where the crossing is; that he did not take his eyes off the deceased, and that he never saw him look around at any time; that he could not tell how far the pilot knocked him; that the deceased was on the right-hand of the railroad track, between the rails, when struck, and that the fireman, who was sitting on the left-hand side of the engine, could not have seen him at all after he was struck. He also stated that he blew the whistle "between a half and a quarter of a mile south of this crossing where the accident happened"; that the train hit the deceased in the back; that when the train struck him he went immediately to the right, but that he could not tell

for sure about that; that, after he fell back against the engine, he didn't see him any more until he was picked up.

This witness, the engineer, was corroborated by the fireman as to the time the deceased was discovered on the track, the fog that prevailed, the blowing of the whistle, the statement that the deceased veered to the right of the track, and the efforts made to stop the train; but he stated positively that the bell was rung continuously from the time the train left the city of Waco until the happening of the accident. He also stated that, when the deceased was struck, he "was thrown right off on the right-hand side of the track. He was thrown off of the track right about the place where he was struck." Several other employés of the appellant testified that the whistle was sounded just before the accident occurred and that their attention was attracted by the continuous sounding of it.

Sam Chase, a witness offered by the appellant, testified that he was a passenger on the train the morning of the accident; that he had been railroading for 21 years, and was at the time of giving his testimony in the case working for the appellant; that he assisted in putting the body of the deceased on the train; that at the time it was picked up it was lying about 75 yards north of the crossing. On cross-examination he said that he had seen trains running at a rapid speed hit objects on the track and knock them quite a distance. He further said:

"Yes; I make that testimony that it [the body] was 75 feet north of the crossing, in face of the fact I got off the train and went immediately to the body, helped the people put him on, and got on as quickly as I could, * * * and we pulled out as soon as we could."

Dr. J. H. Thomas, a witness introduced by the appellant, testified:

That he had been the railroad surgeon since about January, 1915; that on the day of the accident he was called to see Mrs. Luten; that after he had been at her house about 20 or 30 minutes he, with G. L. Johnson and some others, went over to the road crossing; that after they got to the crossing they went north on the railroad track and found a hat, supposed to be Mr. Luten's hat, off the track on the east side; that the hat was picked up, and that they "went further on up the track, to see if we could see where the body was supposed to have been found, but didn't find anything, only a place where there was a disturbance in the gravel, like where people had walked around. * * * I didn't step to see how far that was north of where we found the hat, but it was about 20 steps. I stepped the distance from the crossing to even with where we found the hat, and it was 45 steps, or 130 feet. * * * Mr. Johnson was there, and I think he is the man that picked up the hat, and somebody picked up a candidate card there somewhere. I didn't see any blood on the weeds; if there was blood on the weeds there, there is no reason why I didn't see it."

In this connection it may be stated that G. L. Johnson, the man referred to by the witness Dr. Thomas, testified that the hat found was about 15 feet north of the road crossing

on the east side of the track and about 8 feet from the track; that he did not see Dr. Thomas measure or step the distance from the road crossing to where the hat was lying; that about 15 feet north of the hat he saw where something had hit the ground near the end of the ties and knocked a hole in the ground, and that there was blood on the ground there; that further north about 40 feet, and about 16 feet from the track on the east side, there was a place where something had hit the ground, and there was blood on the weeds there. Further phases of the testimony will be disclosed in the discussion of the assignments of error.

[1] The law seems to be well settled that the omission of the signals required by statute on approach of a train to a highway crossing can be treated as negligence per se only in cases of those using or about to use such highway; that is to say, the failure to give crossing signals is, by law, made negligence only "with respect to those for whose protection the statute was designed. As to others, the omission may or may not constitute negligence in fact; the question depending on the circumstances of the particular case, and being one for the jury, and not for the court, to determine." Railway Company v. Saunders, 101 Tex. 255, 106 S. W. 321, 14 L. R. A. (N. S.) 998, 16 Ann. Cas. 1107. In this case the Supreme Court takes occasion to discuss the question very fully, and to review a number of decisions theretofore rendered upon the subject by both that court and Courts of Civil Appeals. Some of those decisions are approved and followed, some of them disapproved, and others distinguished. But the rule, as above stated, is firmly established. There seem to be no peculiar circumstances in the case at bar, if the deceased was not struck by appellant's train at the dirt road crossing, that raised an issue of fact for the determination as to whether or not the failure of appellant's employés in charge of the train to give the statutory signals for said crossing constituted negligence, and if the evidence shows conclusively that the deceased was struck by appellant's train at a place other than said crossing, and while he was a trespasser upon appellant's track, as contended by appellant, the deceased was not entitled to the protection of the statute in question, and the failure to give the signals as the train approached the crossing gives them no cause of action, and their right of recovery depends solely upon the issue of whether or not the appellant's employés in charge of the train could have stopped the same, by the use of the means at their command, after discovering Luten's peril, in time to have avoided striking him, and failed to exercise ordinary care to do so.

[2] Do the facts conclusively show that the deceased was not struck by appellant's train at the dirt road crossing, but away from said crossing, and whilst he was walking north on

appellant's railroad track? We think not. The testimony offered by the appellees on the trial in which the judgment from which the present appeal is taken is practically the same as it was on the former appeal, and what we said upon this question in our opinion on that appeal is pertinent and applicable under the facts and circumstances shown by the record now before us, notwithstanding the testimony of appellant's engineer and fireman, who claim to have witnessed the unfortunate accident. We then said, and now repeat, that from the location of the wounds found upon the body of the deceased, and the proximity of his hat and body to the crossing, together with other circumstances in evidence to be considered, it may reasonably be inferred that he was at the crossing when struck by the train. The conclusion is warranted that he traveled east after leaving his home along the road leading to the crossing until he reached the railroad; and that he was going straight across the track from the west to the east side thereof when the collision occurred, and not walking north in the direction the train was moving, is a reasonable, and not an improbable, deduction from the facts and circumstances proved. The serious wounds, if not all of them, that were inflicted upon the deceased, were on the right side of the body. This is a strong fact or circumstance tending to show that he was standing facing the east, or moving directly across the railroad track, when struck. It is clear that, if he was walking north along the railroad track when struck, the wounds inflicted upon him would have been on his back, the back part of the head, and the back part of his leg. The fact that the wounds were on his right side is entirely consistent with the idea that he was, standing or walking with that side of his body toward the approaching train when the collision that cost him his life happened.

True, it is possible, or even probable, that he may have turned his right side towards the train just before the collision; but that he did so is no more to be inferred from the established facts and circumstances than that he was going straight across the track. And while it is possible, it is not very probable, it occurs to us, that the deceased attempted to cross the railroad track north of the dirt road crossing, at or near where his body was lying when found. The railroad bed or dump at that point was several feet high, and evidently more difficult to pass over than at the road crossing, and there is nothing to indicate why he may have left the traveled road to cross the track at such a place. Moreover, his hat, as has been stated, was found within 15 feet of the crossing, some letters belonging to him about 30 feet from the crossing, and his body at the greater distance of about 40 or 50 feet therefrom, indicating that, after being struck by the train, he was carried, before being cast to the side

203 S.W.—58

of the track, some distance; for it is an exceedingly fair inference that the deceased's hat was caused to fall from his head by the collision, and that, if it fell directly to the ground, the location of the deceased's body indicates that it was pushed or thrown thereafter by the train the distance of 25 or 30 feet. Again, it is not at all improbable that, after the deceased was struck, his hat, after being dislodged from his head, was carried by the suction or agitation of the air produced by the running train some distance in the direction the train was moving, and this would suggest that he was at the crossing, or at least nearer to it than at the point where his hat was found, when the collision occurred. At all events, we think it cannot be said, from the facts and circumstances shown, as a matter of law, that the deceased was not at the crossing when struck by the railway train,

[3] Now it is settled law in this state that, to authorize the court to take a material issue from the jury, the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. This has been affirmed in many decisions of our courts. The testimony of the witnesses introduced by appellant, which was not before the court on the former appeal, does not necessarily, we think, require a finding that the deceased was not struck by appellant's train at the crossing in question. The testimony of these witnesses in important particulars is not in harmony with the fair and reasonable inferences and deductions to be drawn from certain relevant facts and circumstances established by the testimony of witnesses offered by the appellees. That testimony is to the effect that the engine struck the deceased in the back, while the wounds inflicted upon the body of the deceased unmistakably indicate that they were inflicted on the side of the body and head, and just where he would necessarily be struck, if, as appellees contend, he was walking directly east over the crossing when hit by the engine. The finding of the deceased's hat, and letters belonging to him, and blood on the ground so near the crossing, are cogent circumstances indicating that the deceased was struck by the train at or very near the crossing, contrary to the testimony of appellant's witnesses. Besides, there are inconsistencies or contradictions in the testimony of some of appellant's most important witnesses, and the jury were the exclusive judges of their credibility and the weight to be given to their testimony. In weighing this testimony, the relation of the witnesses to the appellant as employés, and their probable interest in its behalf as such, were proper matters for the consideration of the jury, and their verdict indicates the testimony was unsatisfactory, and that at least vital parts of it were discarded.

In view of all the facts and circumstances

of the case, we do not feel authorized to say that it was conclusively shown that the deceased was not struck at the crossing. It is true the witness Johnson on cross-examination said he merely estimated the distance from the crossing to where the hat of the deceased was found, and the appellant's surgeon, Dr. Thomas, stated that he stepped the distance, which he says he found to be 130 feet; but the value and weight to be attached to the respective statements of these witnesses was for the jury. Neither the ability of the witness Johnson to closely approximate the distance from the crossing to the place where the hat was lying, nor the correctness of his estimate, was, except by the testimony of Dr. Thomas, called into question, and the jury was authorized to conclude that he was not as badly mistaken in his estimate of the distance as the testimony of that witness would indicate. Dr. Thomas merely stepped the distance, and according to his statement of the number of steps Johnson underestimated the distance 115 feet. This is hardly probable, and the jurors were warranted in concluding, as they evidently did, that Johnson's estimate of the distance was accurate. Besides, Johnson, who was present when Dr. Thomas claims he stepped the distance, says that he did not see Thomas step it, and the jury may have concluded that he did not in fact step the distance, but merely estimated it, as he did the distance from the hat to the place where he discovered "a disturbance in the ground like where people had walked around."

[4] Having held that the evidence raised an issue of fact as to whether or not the deceased, Luten, was struck at the crossing, it becomes necessary to consider whether or not it raised issues of negligence with respect to the speed at which the train was being propelled and the failure to give the statutory signals as the train was approaching the crossing. First, could negligence be predicated upon the speed of the train? We think so. That this crossing should be classed as a public one, though not established by the commissioners' court or worked by the county, so far as the giving of the statutory signals is concerned, can hardly be questioned. It was over a high dump in appellant's road. The approaches, which extended back about 35 feet, were built by appellant, and the crossing maintained by it. For many years the crossing, with full knowledge of appellant, had been habitually used by the people in the neighborhood, and the necessity for giving the statutory warnings for their protection prior to the accident in question had been recognized by appellant, and such warnings usually given. The undisputed evidence shows that the train which struck and killed E. E. Luten was running 35 or 40 miles an hour as it approached this crossing, and that a dense fog prevailed. The crossing, it is true, was in the country; but it was a public one, in the sense that it was commonly used by pedestrians and persons traveling in wagons, buggies, and other vehicles, and a place where the operatives of appellant's train might expect persons to be at any time. In approaching such a crossing, although it be in the country, railway companies have no right, regardless of the danger to persons that may be lawfully using the crossing, to operate its trains at such speed as they see proper. Although the place of the accident is in the country, and there is no statute regulating the speed of trains, yet negligence may be evidenced by the speed at which the train is being propelled, when considered "in connection with the place of the accident and the circumstances surrounding it." It was the duty of appellant's servants on the occasion in question to exercise ordinary care, and whether they were exercising such care in the speed of the train under the circumstances of the situation was a question for the jury. The case of Railway Co. v. Langham, 95 S. W. 686, cited by appellant, does not, in our opinion, announce a contrary rule. Instead, the rule as stated here is distinctly recognized.

[5] Did the evidence show beyond controversy that the statutory signals were given? We think this question should be answered in the negative, notwithstanding there is positive testimony of some of appellant's witnesses that they were. The testimony of the engineer is to the effect that he sounded the road crossing whistle about one-quarter of a mile distant therefrom, but that just before, or about the time, the bell, which had been ringing for the Dallas-Waco road crossing, was stopped, and not started again until the stock alarm whistle was blown, when he discovered the deceased on the track. As to the sounding of the whistle, the fireman's testimony is practically the same as that of the engineer; but he testified that the bell was not only kept ringing after the Dallas and Waco dirt road had been passed, but made the unreasonable statement that the bell "had been ringing all the time since we left Waco," a distance of about 19 miles. In this latter statement the fireman was contradicted by the engineer who said:

"Yes; put the bell to ringing when we approached that Dallas and Waco crossing with the railroad, and then cut the bell off after passing that crossing, and the bell was started to ringing next after I blew the whistle for this man. No; the bell was not ringing all the way from Waco."

These were the only witnesses who testified in regard to the ringing of the bell. The train passed along on the east side of the deceased's house, and Mrs. Luten, who was sitting in the east room of her house as the train approached the crossing where the deceased was struck, and who heard the noise of the train, but could not see it on account of the density of fog, said:

"I heard the train that morning as it went by. The whistle was not blown that morning for that crossing. I heard the train coming before it got even with the house. It wasn't making very much noise. The first time I heard the whistle blown, it blew two 'short blasts, and then stopped right after that; while it was coming to a stop I could hear a grating sound. When I heard the two short blasts, and the stopping of the train right after that, the train was over in the direction of that crossing near where Mr. Luten was found."

This positive testimony of Mrs. Luten is not qualified by any other statement made by her in reference to the blowing of the whistle for the crossing in question. She said that, if the engineer sounded the whistle for the Dallas and Waco crossing, which was a half mile or mile south of the crossing where it is claimed the deceased was struck, she did not hear it; that she did not mean to tell the jury it did not blow for that crossing. In addition to Mrs. Luten, other witnesses introduced by appellees testified with respect to the blowing of the whistle at or near the crossing. W. W. McCoy, who lived about three-quarters of a mile away, said that at the time Mr. Luten was killed he was at home chopping wood; that he did not see the train, but heard it; that he also heard the report of a gun, and that right after he heard the report of the gun he heard the whistle of the train give two short blasts, and that the train then stopped. He further said that he heard the noise of the running train before he heard the report of the gun, that he heard the whistle just after the report of the gun, and that he did not hear the whistle before the gun fired. N. H. Humphreys' testimony was substantially the same as the witness McCoy. He did not hear the noise of the train, but heard the report of a gun and train whistle blowing. He said:

"I heard the report of the gun before I heard the train whistle blow. After hearing the gun, I heard two short blasts of the locomotive whistle. * * * I did not hear the train blow before the two short blasts."

This testimony, we think, conflicts with the testimony of appellant's engineer and fireman, and was amply sufficient to raise an issue of fact as to whether or not the whistle of the locomotive was sounded as required by statute as the train approached the crossing. It is not purely of a negative character as was the testimony in Railway Co. v. Kutac, 76 Tex. 473, 13 S. W. 327, and Railway Co. v. Anderson, 126 S. W. 928, and a decision of the question is not governed by those cases. Its probative force is at least equal to that of the testimony touching a similar question in the case of Southern Traction Co. v. Owens, 198 S. W. 150, and in that case a writ of error was denied. So far as the ringing of the bell is concerned, the testimony of the engineer and fireman, the only witnesses who testified on that issue, is in conflict, and the testimony of the engineer clearly warrants the conclusion that the bell was not continuously rung from a distance of at least 80 rods from the crossing as the train approached it, but that it was not started to ringing until the locomotive was in a much less distance from the crossing. Whether the failure to give these signals was the proximate cause of the injury and death of E. E. Luten was a question for the jury. Clearly we would not be authorized to say as a matter of law it was not.

[6] The next contention of appellant is that the testimony conclusively shows that, after appellant's servants in charge of the train discovered the peril of the deceased, they did all in their power to stop the train and avoid injuring the deceased, but were unable to do so; therefore the issue of discovered peril was not in the case, and that issue should not have been submitted to the jury. We are not prepared to say the testimony is of that conclusive character upon this question claimed for it by appellant. Whether the operatives of appellant's train discharged the duty imposed upon them by law, after discovering the peril of the deceased, to avoid striking and injuring him, was, in our opinion, a question for the jury. The testimony of the engineer is that the locomotive was about 150 or 200 yards from the deceased when he discovered that the deceased was a man; that he then blew the stock alarm whistle, and the deceased veered to the right, and he thought he was going to get off the track, but that he did not do so; that the train was running at the rate of 40 miles an hour; that he did not know how far the train ran, after he blew the whistle and saw the deceased was not going to get off the track, until he put on the brakes; that he supposed he ran 200 or 300 feet from the time he blew the whistle until he put on the emergency brakes; and that the only brakes he put on were the emergency brakes. The fireman said that, when they first saw Mr. Luten on the track, the engineer made an application of air, and not until they got within about 250 feet of the deceased did he apply the emergency brakes and open the sand pipes. The engineer also testified, as we have shown, that the deceased was 200 or 300 feet north of the road crossing when struck, and that when he saw the object on the track and blew the whistle the first time he must have been just south of the crossing a few yards; that it was either a short way south of the crossing, or about at the crossing; that he kept his eyes on the deceased all the time after he discovered him on the track, and at no time did he see the deceased look around. So that whether, under all the facts and circumstances shown, the operatives of the train exercised that degree of care and diligence required by law to stop the train and avoid striking the deceased was an issue of fact, and not one of law.

While appellant could not be charged with negligence until its servants in charge of the train actually discovered the peril of the

deceased, "still it would be liable if, after such discovery," they "failed to use the greatest precaution to avoid injuring" him. Sanches v. Railway Co., 88 Tex. 117, 30 S. W. 431. Whether the engineer was justified, especially since the deceased failed to give evidence of knowledge of the approaching train by looking in its direction, in concluding, from the mere stepping of the deceased to near the east rail, that he was going to leave the track, and the consequent delay in applying the emergency brakes and opening the sand pipes, were pertinent and legitimate matters for the consideration of the jury upon the issue. Again, the testimony authorizes, as we have held, that the deceased was at the crossing when struck, and, if he was, the emergency brakes and sand, according to the testimony of the engineer, were not used until the locomotive approached within a few yards of the crossing. We would not be justified in saying as a matter of law that the issue of discovered peril was not raised by the evidence.

[7] The second assignment of error complains of the refusal of the court to give a special charge, requested by appellant, that, unless the jury believed that E. E. Luten was struck while upon the road crossing, they could in no event find in favor of the appellees. There was no error in refusing this charge, for the reason that it ignored the issue of discovered peril, and required a finding absolutely in favor of appellant, unless the deceased was at the road crossing when struck by the locomotive. Besides, the issue of whether or not the deceased was struck at the crossing was submitted in the court's general charge. Nor did the court materially err in refusing to give appellant's special charge on the question of contributory negligence. It may be doubted that contributory negligence was an issue in the case; but, if it was, the court's charge upon the subject was very slightly less general than the requested special charge. Practically the only difference in the special charge and the general charge, in submitting the question, is that the special charge imposed upon the deceased, which the general charge did not in terms do, the duty of exercising ordinary care "to ascertain the presence or approach of a train to avoid striking him." The general charge did define ordinary care and contributory negligence, and told the jury in effect that, if the deceased went upon appellant's railroad track without using the care and caution which would have been used by an ordinarily prudent person under similar circumstances, and such failure proximately contributed to his injury, he could not recover.

The court's general charge upon the issue of discovered peril was also sufficient, we believe, to protect the rights of the appellant, and the refusal of the special charge requested by appellant in relation thereto affords no sufficient ground for a reversal of the case.

Besides, the court gave a special charge requested by appellant upon the issue, and the refusal of another requested charge upon the same issue is not reversible error. The special charge given, however, presented the theory of the one refused.

[8] The court charged the jury as follows: "Bearing in mind the foregoing definition, you are further instructed that the law requires those in charge of railway engines and trains to use great care and prudence in operating them, so as to avoid injury to the persons of other people. And if, by the want of such care or prudence, injury is inflicted upon others, without the fault of themselves, such company would be liable for such injury and damage."

Appellant complains of this charge, and cites Railway Co. v. Smith, 87 Tex. 348, 28 S. W. 520. The charge in question is almost literally the same as that given in Railway Co. v. Matula, 79 Tex. 577, 15 S. W. 573, which under the facts of that case was approved by the Supreme Court. In the later case, however, of Railway Co. v. Smith, supra, the Matula Case was discussed and limited as to the degree of care required of railway companies at public crossings to prevent injury to persons upon such crossings, and the rule announced to be that such companies must use ordinary care to discover the presence of persons at such crossings and to avoid inflicting injury upon them, and that in the exercise of that degree of care they must use such an amount of vigilance and caution as a man of ordinary prudence would use under like circumstances. But in view of the facts in Railway Co. v. Matula, and another charge given therein, to the effect that, if the jury should find "that the injuries complained of were inflicted by the defendant, by the negligence and want of due and proper care on the part of its employés," to find for the plaintiff, the affirmance of the case was held to be proper, notwithstanding the giving of the incorrect charge. For similar and as strong or stronger reasons, we think it may be said that the like charge here complained of should not require a reversal of this case. There was no application in the present case, as there was in the Smith Case, of the charge to the facts of the case, and it was in no way referred to in any paragraph of the charge in which the facts are grouped and the conditions upon which a verdict for the appellees was authorized. On the contrary, negligence and ordinary care were properly defined in the first and second paragraphs of the court's general charge, and in the paragraphs thereof enumerating the facts which the jury was required to find, in order to return a verdict in favor of appellees, the care imposed upon the appellant was ordinary care as defined in the second paragraph of the charge, and the negligence therein referred to was the negligence defined in the first paragraph of the charge. So, as was similarly said in Railway v. Smith, supra, we may say here that, considering the whole

·charge, the jury must have understood that the degree of care incumbent upon appellant was ordinary care, and that by the charge ·complained of the jury must have understood that the appellant, under the circumstances of the case, was required to exercise a great amount of vigilance. At any rate it is not ·probable, in view of the entire charge, that the jury, by the charge under consideration, was misled to the prejudice of appellant. 'The fifth assignment of error is therefore overruled.

The eleventh assignment of error asserts that the twelfth paragraph of the court's charge is upon the weight of the evidence, in that it assumes that deceased was struck upon a crossing, whereas the uncontroverted evidence shows that he was struck on de- ·fendant's track at a private place where the ·right of way was fenced. We do not so con- ·strue this paragraph of the charge. It dis- tinctly submits, in our opinion, for the de- cision of the jury, the issue whether or not ·the deceased.was at or upon the crossing.

There are a number of other assignments ·of error, but the several questions presentéd .by them have been discussed and disposed of against appellant by what we have said in ·our consideration and treatment of the first .assignment of error.

Believing the record discloses no reversible ·error, the judgment of the district court is affirmed.