EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* SANTIAGO RODRÍGUEZ ROSARIO, acusado y apelante.

No. 5322.—*Sometido:* Marzo 21, 1934.   *Resuelto:* Septiembre 29, 1934.

*Mariano Acosta Velarde*, abogado del apelante; *R. A. Gómez, Fiscal*, abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Santiago Rodríguez Rosario fué acusado de un delito de homicidio involuntario. Se alega en la acusación que allá por el día 20 de febrero de 1932, el referido Santiago Rodríguez Rosario, Eduardo Pérez Rivera y Sebastián Mejías Carrero, mientras operaban y conducían bajo su dirección y cuidado la locomotora 85, de la American Railroad Co. of Puerto Rico, actuando como maquinista el apelante, debido a la negligencia, descuido, y falta de prudencia y circunspección de dichos acusados en el manejo y dirección de la máquina, arrollaron en el barrio Higuey, del término municipal de Aguadilla, al ser humano José Alers Valentín, quien falleció el 26 de febrero de 1932 a consecuencia de las heridas recibidas.

Los acusados solicitaron una relación detallada (*bill of particulars*) de los hechos constitutivos de negligencia, descuido o falta de prudencia y circunspección que se les imputaban. Accedió el fiscal a lo solicitado, formulando algunas alegaciones adicionales en un pliego de particulares que hizo formar parte de la acusación y que refiriéndose al apelante dice así:

"Que Santiago Rodríguez Rosario, en el sitio y fecha a que se contrae la acusación, manejaba, guiaba, y operaba la máquina número ochenta y cinco de la American Railroad Company of Puerto Rico a tóda marcha, y siendo su deber reducir la velocidad de aqué-

lla al aproximarse al cruce donde fué arrollado el ser humano José Alers Valentín, en el que atraviesa las vías ferroviarias un camino abierto al tráfico público y de tránsito constantemente frecuentado, allí y entonces, y mientras el indicado José Alers Valentín atravesaba a pie dicho cruce, dicho acusado, descuidada y negligentemente, y con conocimiento de las anteriores circunstancias, rehusó reducir y no redujo la marcha de la máquina expresada, ocasionando de este modo con los otros coacusados, la muerte del individuo José Alers Valentín en la forma que refiere la acusación.''

El apelante excepcionó la acusación basándose en que los hechos expuestos en la misma no constituyen delito público contra él. Las excepciones perentorias fueron desestimadas. Al terminar la prueba de cargo, fué absuelto el acusado Eduardo Pérez Rivera, conductor de la locomotora. Practicada toda la prueba y sometido el caso al jurado, éste rindió un veredicto absolviendo a Sebastián Mejías Carrero, fogonero, y declarando culpable de un delito de homicidio involuntario al maquinista Santiago Rodríguez Rosario.

■■ Alega en primer término el acusado apelante que la corte incurrió en manifiesto error al declarar sin lugar las excepciones perentorias interpuestas contra la acusación.

Durante la vista de la causa ante este tribunal, el abogado del apelante alegó con énfasis que siendo la acusación original defectuosa, el pliego de especificaciones o *bill* de particulares no llenaba las lagunas que se advertían en dicha acusación. Es de notarse que el pliego de especificaciones fué servido a solicitud del propio acusado y que el fiscal expresó que formulaba dichas alegaciones adicionales para que formasen parte de la acusación. Creemos, sin embargo, que no es necesario decidir la cuestión que planteara verbalmente el abogado de Santiago Rodríguez Rosario, porque, a nuestro juicio, la acusación originalmente formulada basta para sostener el delito de homicidio involuntario que se imputa al acusado.

El artículo 328 del Código Penal declara que todo conductor, maquinista, guardafrenero, guardaagujas, u otra persona encargada del todo o en parte de cualquier vagón, loco-

motora, etc., o cualquier otra persona encargada del todo o en parte del deber de despachar o dirigir los movimientos de dicho vagón, locomotora, etc., que por imprudencia temeraria o descuido lo dejase o hiciese chocar con otro vagón, locomotora, etc., ocasionando de este modo la muerte de una persona, incurrirá en pena de presidio por un término máximo de cinco años. El artículo 203 del mismo código declara que el homicidio es involuntario cuando ocurre al realizarse un acto ilegal que no constituye delito grave; o al realizarse un acto legal que pudiese ocasionar muerte en forma ilegal, o sin la debida prudencia o circunspección. Prácticamente la acusación original emplea el mismo lenguaje del estatuto. Se alega que los acusados Santiago Rodríguez Rosario, maquinista, Eduardo Pérez Rivera, conductor, y Sebastián Mejías Carrero, fogonero, operaban y conducían bajo su cuidado, una locomotora, y se dice que debido a la negligencia, descuido y falta de prudencia y circunspección de dichos acusados en el manejo y dirección de la máquina indicada, arrollaron al ser humano José Alers Valentín, ocasionándole lesiones que le produjeron la muerte. Convenimos en que la acusación ha podido ser más específica, pero en nuestro sentir contiene hechos bastantes para informar al acusado de la naturaleza y carácter del delito que se le imputa, y no creemos que sea absolutamente necesario especificar detalladamente en qué consistió el descuido, la negligencia o la falta de prudencia y circunspección.

En el caso de *Schultz* v. *State*, 130 N.W. 973, la Corte Suprema de Nebraska se expresó así:

"Los autos demuestran que el acusado entendió completamente la naturaleza del delito y que condujo su defensa en tal forma que hubiese quedado exonerado de responsabilidad criminal si el jurado hubiese creído su evidencia. Una cuestión igual fué presentada ante la Corte Suprema de Missouri en el caso de State v. Watson, 216 Mo. 420, 115 S.W. 1011, sobre una información similar en la cual se imputó al acusado el haber matado a una persona mientras descuidada y negligentemente manejaba un automóvil en cierta calle de la ciudad de St. Louis."

Copia la corte las conclusiones de la Corte Suprema de Missouri, y termina diciendo que la acusación en el caso fué suficiente al imputar al acusado el delito de que fué declarado convicto.

Copiamos a continuación lo que dice la Corte Suprema de Missouri en el caso de *State* v. *Watson,* supra, citado por la corte de Nebraska:

"Dirigiendo nuestra atención a la primera cuestión suscitada respecto a la suficiencia de la acusación para sostener la sentencia, hallamos que la acusación imputa al acusado la comisión del delito de homicidio voluntario en' cuarto grado y ques se basa en las disposiciones del artículo 1834 de los Estatutos Revisados de 1899 (Estatutos Anotados 1906, pág. 1269) que dice: 'Toda muerte de un ser humano causada por el acto, impericia o negligencia voluntaria de otra persona, que equivalga al delito de homicidio en el derecho común, que no sea excusable o justificable, o que no esté declarado como homicidio de otro grado por este capítulo, será considerada como homicidio voluntario en cuarto grado.' La cuestión aquí envuelta parece ser una de primera impresión en lo que a las conclusiones de la corte se refiere. Los letrados que representan tanto al estado como al acusado no han llamado nuestra atención a ningún caso fundado en un estado similar de hechos, ni nos ha sido posible, después de una minuciosa búsqueda, descubrir ningunas decisiones que sean especialmente aplicables al punto aquí envuelto. Por consiguiente, la solución del problema que está ante nos debe hallarse mediante la aplicación de preceptos bien establecidos. Es cuestión fundamental que una acusación fiscal o del gran jurado basada en las disposiciones de un estatuto debe imputar el delito en el lenguaje del estatuto, y las alegaciones contenidas en la acusación fiscal o del gran jurado deben ser suficientes para informar ampliamente al acusado de la naturaleza del delito de que responderá al sometérsele a juicio final. Bastará decir sobre esta cuestión que, aplicando el principio fundamental de procedimiento en causas criminales, nuestro juicio esta acusación imputa suficientemente el delito de que se declaró culpable al acusado. El estatuto en que se basa esta acusación dispone que la muerte de un ser humano causada por el acto, impericia o negligencia voluntaria de otra persona, que equivalga al delito de homicidio en el derecho común, que no sea excusable o justificable, o que no esté declarada como homicidio de otro grado, será considerada como homicidio voluntario en cuarto grado. Los he-

chos en que se basa esta acusación fueron el uso y conducción negligente de un automóvil, cuyo manejo es universalmente reconocido está acompañado de mucho riesgo para los viandantes que hacen uso de las calles. Esta acusación alega que el acusado guiaba el automóvil descuidada, aviesa y negligentemente. Le imputa que allí y entonces se hallaba a cargo y tenía el dominio y control de cierto automóvil que era conducido y guiado por la calle Locust, que es una vía pública de la referida ciudad de St. Louis, y que el aludido Jesse Watson, allí y entonces en dicha ciudad de St. Louis, el 31 de octubre de 1907, criminal, descuidada, aviesa y negligentemente, guió y condujo dicho automóvil con gran fuerza y violencia contra y sobre dicha Cristina Musick. Entonces continúa alegando las heridas causadas al guiarse dicho automóvil tan descuidada, aviesa y negligentemente, así como que el acusado descuidada, aviesa y negligentemente lanzó a la referida Cristina Musick al suelo y sobre el pavimento, e hizo que dos de las ruedas de dicho automóvil pasaran por sobre la cabeza y cuerpo de dicha Cristina Musick, produciéndole así ciertas heridas de las cuales ella murió. Ésta, a nuestro juicio, es una imputación suficiente que informó plenamente al acusado de la naturaleza del delito de que debía responder. En nuestra opinión no era esencial que la acusación expusiera detalladamente en qué consistió el descuido, impericia o negligencia; y que la alegación de que guiaba y conducía este automóvil por una calle pública descuidada, aviesa y negligentemente servía para notificar al acusado de que no usaba, manejaba o conducía su automóvil de conformidad con la ley o las ordenanzas de la ciudad que reglamentan el uso y manejo de tales vehículos. Evidentemente el acusado sabía que tendría que afrontar la imputación de descuido, impericia y negligencia en el manejo de su automóvil, y al hacer frente a tal imputación es indudable que su única defensa hubiese sido que guiaba y conducía el automóvil de conformidad con las leyes y ordenanzas de la ciudad, debidamente aprobadas, para reglamentar el manejo de tales vehículos. El acusado no pudo ser inducido a error por esta alegación. A él no pudo tomársele por sorpresa. Según las alegaciones contenidas en esta acusación, él debió saber que el estado trataría de probar todos y cada uno de los hechos que tendían a establecer cualquier clase de negligencia, descuido o impericia en el manejo de ese vehículo.''

Las razones expuestas por la Corte Suprema de Missouri para sostener la suficiencia de una acusación muy parecida a la que ha sido objeto de excepción en este caso, nos parecen

aceptables. El acusado no puede llamarse a engaño. En virtud de los cargos formulados contra él, queda informado de que se le imputa negligencia, descuido y falta de circunspección y prudencia en el manejo de la locomotora. Esto en cuanto a la acusación original. Luego el *bill* de particulares informa al acusado de que su negligencia consistió en operar a toda marcha la locomotora que guiaba por un camino abierto al tráfico público y de tránsito constantemente frecuentado, rehusando reducir la marcha de la máquina expresada. Esta especificación, que limita la alegada negligencia, descuido y falta de prudencia y circunspección al hecho de haber rehusado el acusado reducir la velocidad de la máquina, ha recibido de nosotros la más cuidadosa consideración. La velocidad a que debe caminar una locomotora al atravesar un cruce en una zona rural es cuestión que depende de un número de circunstancias, como por ejemplo las condiciones del cruce, su situación, el peligro que pueda existir, y todos aquellos detalles que tiendan a determinar si una persona de prudencia ordinaria estuvo o no justificada, de acuerdo con las circunstancias, en conducir la máquina a una determinada velocidad. En el *bill* de particulares se dice que el maquinista tenía el deber de reducir la velocidad. En términos generales, no creemos que pueda establecerse esta afirmación. Se ha sostenido que en ausencia de un estatuto y bajo los preceptos del derecho común, el principio de que una compañía ferroviaria debe ejercer su franquicia con debido respeto a la seguridad de sus pasajeros y a la de las personas que puedan cruzar la vía en un camino público, demanda de dicha compañía que al establecer el grado de velocidad a que sus trenes puedan correr ejerza debido cuidado, no solamente con respecto a la seguridad de los pasajeros, sino también de todas las personas que en el ejercicio de un cuidado ordinario crucen sus vías en un camino público.

Esta corte, en el caso de *Ferrer e Hijo* v. *American Railroad Co.*, 39 D.P.R. 44, se expresó así:

"De conformidad con las autoridades, según el examen que de ellas hemos hecho, en tal cruce, que no es claramente un cruce público, el deber de la compañía es dar algún aviso y usar el cuidado ordinario. La ley no exige que en estos sitios rurales los trenes reduzcan la velocidad.

"Sin embargo, la conclusión principal de la corte inferior fué que el accidente se debió a haber dejado el tren de la demandada de reducir la velocidad. La corte basó esta conclusión en la ley de diciembre 6, 1917 . . . . .
‸‸ ⁎        ⁎        ⁎        ⁎        ⁎        ⁎        ⁎ ,,

"De una mera inspección de esta ley se desprende claramente que el deber de reducir la velocidad surge solamente al cruzar las calles y que toda la ley es aplicable a cruces reconocidos como caminos públicos. En modo alguno es el camino en cuestión un camino público dentro del significado del estatuto."

En el caso de *St. Louis–San Francisco R. Co.* v. *Prince,* 71 A.L.R. 357, resuelto por la Corte Suprema de Oklahoma, se aprobó por la Corte una instrucción al jurado que dice así:

"Con referencia a la velocidad del tren, se os instruye que en vuestra determinación sobre si la compañía acusada fué descuidada y negligente al manipular dicho tren a la misma velocidad que la prueba demuestre discurría al acercarse y cruzar el paso a nivel en cuestión, podéis tomar en consideración la situación del cruce y de los alrededores y circunstancias, ora dicho cruce fuera o no excepcionalmente peligroso, y de todos los hechos y circunstancias resultantes del caso, determinar si una persona de ordinaria prudencia, bajo similares o idénticas circunstancias, hubiese manipulado dicho tren a la velocidad en que, según vosotros determinéis, dicho tren discurría por y cerca del cruce en cuestión."

A raíz de transcribir la instrucción que antecede, dice la Corte Suprema de Oklahoma:

"La regla general es que, en ausencia de un estatuto regulando la velocidad de los trenes en campo abierto, no hay límite para la velocidad a que puedan correr, excepto aquél que establece una cuidadosa precaución por la seguridad de los trenes y los pasajeros. Cross v. Ry. Co., 120 Kan. 58, 242 P. 469; Mulvaney et al. v. N.Y. Cent. Ry Co., 233 Mich. 350, 206 N.W. 536, 537, en que se cita Robinson v. Ry. Co., 79 Mich. 323, 44 N. W. 779, 780, 19 Am. St. Rep. 174.

"En el último caso citado se dijo: 'Debe presumirse que la parte demandada ha cumplido con las disposiciones de la ley con respecto a cercar su vía y a construir este cruce atendiendo debidamente a la seguridad de las personas y de la propiedad que pasen sobre él, y disponiendo que sus máquinas y carros estén suplidos con los aparatos de rigor. Habiendo hecho esto, la parte demandada tenía derecho al uso de su vía para el paso de sus trenes en todas las ocasiones, para aumentar la velocidad de sus trenes ordinarios cuando se hubieren retrasado, y para hacer circular trenes especiales o irregulares cuando sus negocios lo requirieran. La ley no limita el grado de velocidad de sus trenes. Los negocios del país demandan de los ferrocarriles rápida transportación tanto para las personas como para la propiedad. En ninguna parte se ha resuelto que una velocidad de sesenta millas constituye negligencia cuando un tren atraviesa un campo fuera de villas y ciudades, o a través de una comunidad escasamente poblada. Es sabido que los trenes corren en muchas partes del país a una velocidad de cincuenta o sesenta millas por hora.'

"En Mulvaney et al v. N. Y. Cent. Ry. Co., supra, después de copiar la regla que antecede se dice: 'Como ocurre con todas las reglas, ésta tiene también sus excepciones . . . . . '

"Las excepciones a la regla han sido reconocidas en este estado según puede verse en St. Louis-San Francisco Ry. Co. v. Rundell, supra, donde se copia la regla que aparece en 22 R.C.L. 947, que dice así: 'Un grado de velocidad que ofrecería completa seguridad bajo algunas condiciones, puede, sin embargo, ser en extremo peligroso en otras, y se ha sostenido generalmente que corresponde al jurado determinar si la velocidad a que un tren era manipulado constituyó negligencia o no bajo todas las circunstancias.'

"Entonces se dice: 'La cuestión relativa a si cuarenta millas por hora era una velocidad excesiva mientras el tren bajaba una pendiente, sin hacer ruido alguno, sin tocar campana o sonar el silbato, al acercarse a un camino vecinal en un sitio de mucho tráfico, donde la vista de un lado estaba obstruída, donde el cruce estaba en mal estado conforme se ha dicho antes, era una cuestión de hecho a ser determinada por el jurado y no una de derecho a ser resuelta por la Corte. Éste no es un estado de hechos sobre el cual todo hombre razonable llegaría a la misma conclusión.'

"La regla general debe ser observada y la excepción aplicada solamente en un caso adecuado. La cuestión fué propiamente sometida al jurado mediante una instrucción que correctamente expone la ley, no habiéndose cometido el error apuntado.''

En el caso de *Missouri, K. & T. Ry. Co. of Texas* v. *Luten,* 203 S.W. 909, resuelto por la Corte de Apelaciones Civiles de Tejas, se dijo:

"La evidencia no controvertida demuestra que el tren que arrolló y mató a E. E. Luten caminaba a una velocidad de treinta y cinco a cuarenta millas al aproximarse al cruce, bajo una neblina muy densa. Es cierto que se trataba de un cruce en el campo; pero era un cruce público en el sentido de que se usaba comúnmente por pedestres y personas que viajaban en vagones, coches y otros vehículos, siendo un lugar donde los operadores del tren de la apelante podían esperar que hubiese allí personas en cualquier tiempo. Al aproximarse a tal cruce, aunque sea en el campo, las compañías ferroviarias no tienen derecho a operar sus trenes a la velocidad que consideran propia, sin tener en cuenta el peligro a que se expongan las personas que puedan legalmente usar el cruce. Aunque el sitio del accidente esté en el campo, y no exista ninguna ley regulando la velocidad, sin embargo, la negligencia puede ser demostrada por la velocidad a que el tren camine, cuando se considere en conexión con el sitio del accidente y las circunstancias que lo rodeen. Fué el deber de los empleados del apelante en aquella ocasión ejercer cuidado ordinario y si este cuidado se ejerció en la velocidad del tren bajo las circunstancias de la situación, fué una cuestión a considerar por el jurado. El caso de Railway Co. v. Langham, 95 S. W. 686, citado por el apelante, no enuncia, a nuestro juicio, una doctrina contraria. Por el contrario, la regla, según se establece aquí, es distintamente reconocida."

No puede decirse que el criterio sustentado por la Corte de Apelaciones Civiles de Tejas esté en pugna con la doctrina general establecida por la jurisprudencia. Más bien señala y precisa las limitaciones que la seguridad pública demanda para que los trenes no caminen con rapidez excesiva al atravesar un cruce, cuando las circunstancias aconsejen una marcha moderada a fin de proteger a los viandantes que pasan por dicho cruce. Es decir, la falta de una ley que limite la velocidad de los trenes en campo abierto al aproximarse a un cruce, no autoriza que en el desarrollo de esa velocidad se actúe de una manera negligente y descuidada, con menosprecio de la vida y la seguridad de las personas que puedan

pasar por ese cruce, cuando las circunstancias aconsejen la reducción de la velocidad.

■■■ Ahora bien, ¿concurren en este caso circunstancias especiales que aconsejen la reducción de la velocidad? En caso afirmativo, ¿se ha probado que el acusado dejó de reducir la velocidad al atravesar el cruce y que su negligencia, si es que existe, es de tal naturaleza que apareje responsabilidad criminal? Cuestiones son éstas que nos llevan necesariamente a fijar nuestra atención en los dos últimos errores señalados por el acusado. Se alega que el veredicto del jurado es contrario a la prueba y que ésta es insuficiente en derecho para establecer la culpabilidad del acusado.

Empezaremos por describir el sitio donde ocurrió el accidente, teniendo en cuenta la prueba practicada. En el *bill* de particulares se alega que el sitio del accidente es el de un cruce entre la vía férrea y un camino abierto al tráfico público. Tanto la prueba de cargo como la de defensa demuestran que por la vía cruza un camino que da acceso a una finca de un Sr. Mejías, donde hay unas cuantas casas. A la entrada de esta finca existe un portón y colocado a cierta distancia un letrero donde dice: "Peligro–Prohibido el paso– *Danger–No Trespassing.*"

Melitón Rivera declara que antes de llegar al cruce hay una pequeña curva que impide la vista. El testigo Ramón Gelabert, ingeniero civil auxiliar de la American Railroad Co. of Puerto Rico, declara que hay una recta de ochenta y cinco metros en dirección de Mayagüez a Aguadilla inmediatamente antes de cruzar la vía o vereda que da acceso a la finca del Sr. Mejías, y que estando una persona junto al portón en terreno de la compañía del ferrocarril y parada esa persona a dos metros y medio de distancia de la vía, puede ver un tren en marcha que venga desde Mayagüez a una distancia de 105 metros. También declara dicho testigo que dicho camino no puede ser utilizado para automóviles o carretas, y que es transitable solamente para peatones y animales. El Fiscal sostiene que de acuerdo con la prueba los

letreros anteriormente mencionados tienen el efecto de prohibir el paso por la vía hacia arriba y hacia abajo, o sea a derecha e izquierda del camino; pero no por el camino que cruza la vía. La prueba de la defensa tiende a demostrar que se prohibía transitar por esos terrenos paralela o diagunalmente o en cualquier dirección. El ingeniero Gelabert declara que el camino termina en la finca del Sr. Mejías que queda a una distancia de unos veinte metros de la vía. La prueba demuestra que las personas que vivían en la finca pasaban por la vía para salir a la carretera. En dicha finca había un número de casas que algunos testigos calculan en diez y otros en quince o veinte. La verdad es que por aquel sitio pasaba alguna gente y es lógico suponer que la compañía ferroviaria autorizara el tránsito, porque el Sr. Mejías y sus peones tenían derecho a salir de su propiedad y de acuerdo con la evidencia aportada era ése el camino que facilitaba la salida.

Melitón Rivera dice que los vecinos que allí vivían y el mismo dueño de la finca pasaban frecuentemente por ese camino a todas horas. El interfecto, José Alers Valentín, salía de la mencionada finca, donde vivía, para la Central Coloso, y al atravesar la vía como entre una y dos de la tarde del día 20 de febrero de 1932, fué arrollado por la locomotora No. 85 que venía de Mayagüez, muriendo a consecuencia de las lesiones recibidas. El ingeniero Gelabert dice que la palabra "peligro" que aparece en los letreros se usa porque pueden ocurrir accidentes por razón del tráfico, y que los sitios de peligro son innumerables, como por ejemplo, la aproximación a un puente, a una curva, a una pendiente muy fuerte, la aproximación a un túnel, la aproximación a un cruce de carreteras, de caminos, etc.

Hemos estudiado detenidamente los hechos que culminaron en el accidente y no estamos convencidos de que el acusado haya incurrido en responsabilidad criminal. Melitón Rivera habla de una pequeña curva que impedía ver; el ingeniero Gelabert dice que la vía es recta ochenta y cinco metros in

mediatamente antes de llegar al cruce. También declara que hay una pendiente al aproximarse a dicho cruce, viniendo de Mayagüez en dirección a Aguadilla. Los testigos de la acusación declaran todos que no se dió ninguna señal de aviso y que vieron la locomotora en los momentos en que ocurrió el accidente. Los testigos de la defensa dicen que se tocó pito y campana. El jurado rindió un veredicto de culpabilidad. Es de asumirse que no creyó a los testigos de la defensa. En el pliego de especificaciones no se alega que el acusado dejara de tocar el pito. Se le imputa exclusivamente el hecho de no haber reducido la velocidad. La omisión del aviso indicado, sin embargo, es un elemento a considerar cuando se trata de apreciar si hubo o no negligencia al no reducir la velocidad. Esta precaución no siempre constituye un deber cuando el tren se acerca a un cruce en un campo abierto, a menos que las circunstancias así lo requieran. En el presente caso los testigos que hablan de la velocidad de la máquina no vieron la locomotora antes de ocurrir el choque. ¿Cómo pudieron apreciar que el acusado no redujo la velocidad?

En el caso de *St. Louis, I. M. & S. Ry. Co.* v. *Kimbrell,* 163 S.W. 516, el accidente ocurrió en el pueblo de Beebe, en un cruce de calles. Se alegó, entre otras cosas, que el tren corría a una alta y desusada velocidad a través del pueblo de Beebe y que no dió señal alguna al aproximarse al cruce. Refiriéndose a la velocidad dice la Corte Suprema de Arkansas:

"La rapidez desusada del tren fué un elemento propio de considerar bajo las circunstancias de este caso aunque la rapidez del tren por sí sola no sería suficiente para establecer responsabilidad si todas las demás precauciones fueron observadas por aquellas personas que tenían a su cargo el tren. En Ford v. St. Louis, I. M. & S. Ry. Co., 66 Ark. 363, 50 S.W. 864, el Juez Riddick, hablando a nombre de la corte, se expresó así: 'La conveniencia pública y la necesidad, desde luego, requieren que los trenes corran a un alto grado de velocidad y el simple hecho de que el tren corría rápidamente en el momento en que arrolló a un animal no es prueba de negligencia por parte de la compañía cuando no ocurren otros he-

chos tendentes a demostrar que hubo negligencia bajo las circunstancias al correr a tal velocidad, porque es de esperarse que los trenes corran rápidamente. Pero cuando el accidente ocurre en una ciudad o población populosa, las circunstancias entonces pueden ser tales que el jurado esté justificado en declarar a la compañía culpable de negligencia al correr sus trenes a un grado desusado de velocidad, y esto es realmente cierto cuando las señales fijadas por el estatuto no se dan en los diferentes cruces de calles.' ''

Nótese que en el caso resuelto por la Corte Suprema de Arkansas se trata de una acción civil y no de una acusación criminal. A pesar de tratarse de un accidente ocurrido en plena ciudad, la corte dice que la rapidez del tren solamente no sería suficiente para establecer responsabilidad si se observaran todas las demás precauciones. Dudamos mucho de que en el presente caso las circunstancias sean de tal naturaleza que determinen responsabilidad criminal de parte del maquinista. No hay un testigo de cargo que declare que vió la locomotora antes de ocurrir el accidente. Melitón Rivera habla de una velocidad bastante regular y de una marcha avanzada. Ramón Acevedo dice que el tren paró bastante retirado "de donde le dió el cantazo." A preguntas de la defensa dice que el tren paró bastante retirado, "como de aquí adonde están las últimas gentes." Pablo Rodríguez declara que el tren iba demasiado ligero. Eugenio Iglesias dice que la máquina paró bastante retirado. A preguntas de la defensa dice que el paso a nivel "está como aquí y la máquina le dió y arrastró al señor ese como hasta donde está Ud. y después la máquina fué a parar como adonde están esos otros señores." José LaO Cordero manifiesta que sintió el ruido cuando el tren venía a toda velocidad y que vió la máquina cuando ya estaba parada. Estos testigos presenciaron el accidente, pero no vieron la locomotora hasta el momento de ocurrir la colisión. Ramón Ortiz y Miguel Beltrán, testigos de la defensa, declararon que la locomotora paró a cinco o seis metros del paso a nivel. Eduardo Pérez Rivera dice que dicha locomotora paró a ocho o diez metros del sitio

del accidente. Sebastián Mejías dice que la máquina se detuvo a ocho metros de distancia. De acuerdo con la prueba de la defensa, la locomotora caminaba a una velocidad de quince a veinte kilómetros por hora.

Las decisiones de los tribunales varían en cuanto al grado de negligencia necesario para declarar a una persona culpable de homicidio involuntario; pero todos están conformes en que se requiere una negligencia mayor que la que se necesita para establecer el derecho de una persona a obtener indemnización por daños y perjuicios en una acción civil. Es verdad que el artículo 328 del Código Penal habla de imprudencia temeraria o descuido; pero es claro que el código, al usar esta última palabra, no ha querido significar una mera falta de cuidado, sino un grado de negligencia o descuido mayor que el que se requiere para obtener una indemnización en un caso civil.

En el caso de *People* v. *Adams,* 124 N.E. 575, la Corte Suprema de Illinois se expresó así:

"La verdadera cuestión en controversia en el caso es si el acusado era culpable de negligencia criminal. Ésa era una cuestión de echo a ser determinada por el jurado y a éste se le debió ordenar que considerara ese hecho de acuerdo con instrucciones exentas de error o libres de una errónea exposición de la ley. La cuarta instrucción solicitada por el pueblo y dada por la corte ordena al jurado, en síntesis, que toda persona que conduce un vehículo por la vía pública está en el deber legal de observar, en el manejo de su vehículo, razonable circunspección a fin de impedir causar daño a un semejante. Ésta es la ley, pero la instrucción va más lejos y aduce que toda persona es criminalmente responsable de todo acto de mera negligencia que ocasiona la muerte a otra persona. Para que la negligencia sea criminal, es necesario que sea crasa o temeraria. Negligencia crasa es aquella que toca a los límites de la imprudencia, y negligencia temeraria, tal cual es aplicada al manejo de un vehículo de motor, implica un abandono positivo de las reglas de diligencia y un flemático menosprecio de sus consecuencias, según apunta Babbitt en su obra sobre Vehículos de Motor, sección 1517. Negligencia ordinaria denota meramente una cualidad negativa de parte de una persona a cargo o en el desempeño de un

deber. La responsabilidad criminal no puede estar basada en todo acto legal descuidadamente realizado, meramente porque tal descuido produzca la muerte de una persona. Para que la negligencia sea criminal, es necesario que ésta sea imprudente o temeraria y de tal naturaleza que demuestre un absoluto menosprecio de la seguridad de los demás bajo circunstancias que probablemente produzcan daño a éstos. People v. Falkovitch, 280 Ill. 321, 117 N.E. 398, Ann. Cas. 1918 B, 1077.''

Ésta es la jurisprudencia generalmente establecida. A nuestro juicio la prueba aportada en este caso, teniendo en cuenta todas las circunstancias, es de tal naturaleza que no basta para que pueda dictarse un veredicto de culpabilidad en contra del acusado. No surge de la prueba que éste haya incurrido en una negligencia que apareje responsabilidad criminal. La acusación especifica el cargo de no haberse reducido la velocidad y nosotros entendemos que dado el sitio en que ocurrió el accidente y demás circunstancias que concurren en este caso, no puede decirse que Santiago Rodríguez Rosario sea responsable criminalmente del hecho que se le imputa.

*Debe revocarse la sentencia y declararse absuelto al acusado.*