## GALVESTON, H. & S. A. RY. CO. v. WELLS et al. (No. 9196.)*

Court of Civil Appeals of Texas. Galveston. Jan. 11, 1929.

Rehearing Denied Feb. 21, 1929.

*Writ of error granted.

Baker, Botts, Parker & Garwood, of Houston, Peareson & Peareson, of Richmond, and Proctor, Vandenberge, Crain & Mitchell, of Victoria, for appellant.

C. I. McFarlane, W. J. Knight, and Morris, Sewell & Morris, all of Houston, for appellees Mrs. Wells and others.

D. Edward Greer and B. C. Clark, both of Houston, for appellee Gulf Casualty Co.

LANE, J. On the 25th day of October, 1926, Ray M. Wells was an employee of the Gulf Production Company, which at that time was a "subscriber," as that term is used in our compensation statute, and held a policy of compensation insurance issued by the Gulf Casualty Company.

On said date, while in performance of his duties as such employee, Ray M. Wells was struck and killed by a locomotive engine of the Galveston, Harrisburg & San Antonio Railway Company. Wells left surviving him his widow, Mrs. Annie M. Wells, the plaintiff in this cause, a son, Ray M. Wells, Jr., 10 years of age, and Mr. and Mrs. William Wells, his father and mother.

Upon proper presentation of the claim to the Industrial Accident Board of this state, said board made an award in favor of the plaintiffs against the Gulf Casualty Company for a period of 360 weeks at $20 per week, same being the maximum recovery allowed by law. No notice of dissatisfaction with such award was given by either party.

Later, Mrs. Annie Wells, for her own benefit and as next friend of and for the benefit of Ray M. Wells, Jr., minor son of herself and her deceased husband, Ray M. Wells, instituted this suit against the Galveston, Harrisburg & San Antonio Railway Company, seeking a recovery of $100,000 as damages by reason of the death and consequent loss of her husband.

For cause of action the plaintiffs alleged substantially that the death of Ray M. Wells was caused by the negligence of said railway company in the following particulars: "That the enginemen failed to give the statutory signals by bell and whistle of the locomotive for the crossing; that they failed to sound additional blasts of the whistle after coming closer than 80 rods of the crossing; that the train was moving at a negligent rate of speed; that it was their duty to have the train under control as it approached the crossing, so that it could be stopped in time to avoid striking persons using the crossing, and that they failed to do so; and also because of the alleged character of the crossing;

that it was negligence on appellant's part in not having a bell signal, a wigwag signal, and a joint bell and wigwag signal installed and in operation at said crossing, and in not having a watchman on guard at said crossing, to warn Mr. Wells of the train's approach."

Mr. and Mrs. William Wells, father and mother of deceased, were made parties as required by law, but not being dependent upon the deceased, and desiring that his wife and child should get all the recovery, they answered in the case by filing disclaimers.

The Gulf Casualty Company was made a party defendant by allegations showing that said insurance company carried compensation insurance for the Gulf Production Company, for whom deceased was at work at the time he was killed and then in the performance of his ordinary usual employment, and the plaintiffs admitted that the insurance company, by the right of subrogation, might have a judgment out of the recovery for the amount of insurance which had been assumed by it, and which had been awarded by the Industrial Accident Board.

The insurance company answered, adopting and repleading plaintiffs' petition, and asserting its right by subrogation to be reimbursed for the amount of compensation it had assumed, and which the Industrial Accident Board of this state had awarded.

The railway company answered by general and special demurrers, by a general denial, and by special pleas alleging contributory negligence on the part of the deceased. It alleged further that the train which collided with the automobile in which the deceased was riding at the time was an interstate train, engaged at such time in the transportation of interstate commerce, and was therefore at such time an instrumentality of interstate commerce; the occupancy of the field of interstate commerce by Congress and its control over and regulation thereof by various acts of Congress, including the Interstate Commerce Act, the Transportation Act of 1920 (49 USCA § 1 et seq.), the Federal Employers' Liability Act (45 USCA §§ 51–59) and the Federal Safety Appliance Act (45 USCA §§ 1–46); and that the effect of such laws as a whole is the exercise by Congress, and by instrumentalities by it established, of general and exclusive control over and regulation of interstate commerce by rail, and of such carriers in various aspects of their operation and business. The plea set out various provisions of the Interstate Commerce Act, same being amendments of the existing Interstate Commerce Act made by the Transportation Act; that under the decisions of the Supreme Court of the United States any judgment against appellant in this case would be a wrongful judgment, and its payment a depletion to the extent of such payment of appellant's gross income, and an item of expense necessarily allowable by the Interstate Commerce Commission as a deduction and which would necessarily have to be considered by said Interstate Commerce Commission in fixing rates to be charged by interstate railway carriers; further, that under the provisions of such Interstate Commerce Act, and in its administration by the Interstate Commission, such judgment against appellant would impose an undue burden on interstate commerce; that the defense presented by the said plea involves the proper enforcement and administration of the Interstate Commerce Act, and asserted a right and immunity under such act and such rule of decision of the Supreme Court of the United States, and that appellant is entitled to have its said plea of contributory negligence determined by such rule of decision of the Supreme Court of the United States, and that under such rule the negligence of Wells constitutes a complete bar to any right of recovery by appellees in this case; that, in view of the facts alleged, the Supreme Court of the United States had appellate jurisdiction over this case from the final judgment in the cause in the highest court in the state of Texas in which a decision in this case can be had, and of the decision and determination of the rights, claims, immunities, and defense presented by its plea.

The cause was submitted to a jury upon special issues, in answer to which the jury found: That the operatives of the defendant's train, upon approaching the crossing in question, did sound the whistle at least 80 rods from the crossing, but that a person of ordinary prudence, in the exercise of ordinary care in the ordinary operation of trains, would blow the whistle after coming within 80 rods of the crossing, for the purpose of warning persons about to use the crossing in question of the approach of the train, and that the operatives of the engine pulling the train in question did not, after coming within 80 rods of said crossing, sound the whistle in time to have warned persons about to use the crossing of the approach of said train, and that the failure to so sound the whistle was negligence and a proximate cause of the collision and death of the deceased; that the operatives of the locomotive, upon approaching the crossing, did not begin ringing the bell at least 80 rods from the crossing and continue to ring the same until the crossing was reached, and that such failure was a proximate cause of the collision and death of the deceased; that the operatives of the train, on the occasion in question, on approaching the crossing, did not have the train under control, and such failure was negligence, a proximate cause of the collision and death of the deceased; that a person of ordinary prudence, in the exercise of ordinary care, under the facts shown as to the physical condition, location, and surroundings of the crossing where deceased was killed, would at such time have had installed and in operation a bell at said crossing to warn persons about to use the

same of the approach of said train, and that a failure to have such bell installed and in operation was negligence, and a proximate cause of the collision and death of the deceased; that a person of ordinary prudence, in the exercise of ordinary care, under the facts shown as to the physical condition, location, and surroundings of the crossing, would have had installed and in operation a wigwag at said crossing to warn persons about to use the same of the approach of the train; that a failure to have such wigwag so installed and in operation was negligence and a proximate cause of the collision and death of the deceased; that a person of ordinary prudence, in the exercise of ordinary care, under the facts shown, would have had a watchman on guard at said crossing to warn persons about to use the same of the approach of said train, and that a failure to have such watchman on guard was negligence, and a proximate cause of the collision and death of the deceased; that the train which collided with the automobile of the deceased was, at the time of the collision, being operated at a speed of 50 miles per hour; that under all the facts and circumstances shown the operation of the train at such speed at the time was negligence and a proximate cause of the death of the deceased; and that the deceased was not guilty of contributory negligence.

The jury assessed the damages of the plaintiffs at $30,000, giving the widow $20,000 and the minor child $10,000, and by agreement of the plaintiffs and the Gulf Casualty Company, which carried compensation insurance covering the deceased, the casualty company was given a judgment for $6,293, same being the cash value of the award made by the Industrial Accident Board against the casualty company in favor of the plaintiffs; such sum being deducted from the $30,000 adjudged to plaintiffs. Upon such findings of the jury, the evidence, and agreement, the court rendered judgment for the sums as above indicated. The railway company has appealed.

By its first to twenty-third propositions, both inclusive, appellant substantially insists that it is peculiarly within the province and jurisdiction of the Supreme Court of the United States to determine whether or not the requirement of a state, or a state agency (the Legislature or other agencies), that an interstate carrier should pay out sums of money which would add to the expense of the conduct of its interstate business, are undue burdens on interstate commerce; that the questions as to the right of one to recover for injuries sustained by or through the negligent conduct of interstate carriers, relative to the speed of its trains, the equipment of its cars and locomotives, the sounding of the locomotive bell and whistle, etc., is not one for the determination of a jury of a state court, and therefore the court erred in submitting the inquiries answered by the jury in the present case, and no judgment can be lawfully rendered against appellant, upon such answers, by a state court.

In support of the foregoing contentions, appellant argues that: "By the provisions of title 4 of the Transportation Act (49 USCA § 1 et seq.), and especially the recapture provisions thereof, those providing for aggregate net incomes from uniform rates based on the aggregate value of all the railway properties of the country without reference to respective ownerships of such properties, the prohibition of competition either in rates or by building of new lines, the provisions for division of joint rates between carriers without reference to the relative service rendered by the respective carriers for the express purpose of requiring the stronger carriers to aid the weaker, the provisions for the regulation by the federal government agencies of the insurance of all railway securities and of assumption of indebtedness to the exclusion of the right of the states to regulate any such matters, the requirement for abandonment of nonremunerative lines, that for the use to be made by the federal government of sums received by it under the recapture clause, the character of railway management and its regulation stipulated for, the provision for consolidation of the railway properties of the United States into a limited number of systems without reference to ownerships, the requirement for use by the various carriers of rolling stock and terminals without reference to ownership, the limitation on the right to construct additional tracks, all by express statements in the article enacted in the public interest and for the express purpose of providing adequate transportation for the people of the United States under honest, economical and efficient management, and of providing for a fair return to the respective carriers from rates based on fair values and legitimate expenditures for expense of operation and maintenance, the Congress has occupied the entire field of interstate commerce, and for the definite purposes stated in the act, and therefore any sum of money which any interstate carrier might be required to pay by a state, or by any agency thereof, or by virtue of any state law or rule of decision by its courts, and the payment of which would lessen the efficiency of such carriers or interfere with the performance of its federal duty as an interstate carrier, as defined by said act, or which would unduly add to the expense of the conduct of its interstate business, would be an undue burden on interstate commerce"; that the inhibition against the imposition by a state of an undue burden on interstate commerce extends, by the acts of Congress, to acts of the state Legislature and to all character of state agencies, and that it is peculiarly within the province and jurisdiction of the Supreme Court of the United States to determine whether or not the requirements of a state,

or a state agency, that an interstate carrier should pay out sums of money which would add to the expense of the conduct of its business, is an undue burden on interstate commerce; that the maintenance of a schedule for the performance of interstate commerce and a speed of a train necessary for such maintenance is a necessity, and therefore any requirement of a state agency that interstate trains should approach a public road crossing at a speed which would interfere with the maintenance of its schedule, or that requires that the operatives of such train should have it under control, is an undue burden on interstate commerce; that the imposition of any state agency upon railroads carrying interstate commerce of any requirements which in any manner interfere with the performance of its duties constitutes an undue burden on such commerce, and that any suit based upon the violation of such requirements are governed by the provisions of the acts of Congress and the rules established by the Supreme Court of the United States; that the rules established by our appellate courts and enacted by our Legislature for the trial of suits such as the present case, and which were invoked by the court in the trial of this case, and the statute requiring the use of an engine bell and whistle by the operatives of a train on approaching a public crossing, are in conflict with the "authority of Congress and of the Interstate Commerce Commission over interstate commerce," and therefore the court erred in applying such rules and enactments in the trial of this cause; that under the rule established by the Supreme Court of the United States in the recent case of Baltimore & Ohio R. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, relative to the duty of one about to cross a railroad to look and listen before making such crossing, Ray M. Wells, deceased, was, as shown by the undisputed evidence, guilty of contributory negligence as a matter of law, and the court erred in not so holding and in not rendering judgment for appellant.

We are of opinion that neither the above contention of appellant, nor the argument in support of the same, shows any cause for a reversal of the judgment.

It is inconceivable that Congress, or any agency created by it, intended by any act passed or rule promulgated to prevent the state courts from enforcing reasonable rules enacted by the Legislature of the state and those established by the appellate courts for the protection of the lives, limbs, and properties of our citizens against the reckless and negligent movements of trains, though they are being used in the movement of interstate commerce. We cannot believe that any court would hold that an interstate carrier would be upheld in inaugurating and putting in force a schedule requiring that its trains should run at such a speed as to unreasonably endanger the lives and properties of the citizens, or that it would uphold any other rule established by such carrier which would have such results.

It is unbelievable that Congress, or any agency created by it, has passed any act or promulgated any rule by which it was intended to inhibit the several states from passing, and enforcing through their courts, reasonable regulations controlling the operation of railway trains, passing through their respective states, for the protection of person and property of their citizens. Congress has not, under the power granted by section 8, subd. 3, of article 1 of the Constitution of the United States, to wit, "to regulate commerce * * * among the several states," undertaken to provide schedules for trains transporting interstate commerce, to regulate the speed at which such trains may be run, to make rules for the giving of warning to persons who may be about to cross the railway at public crossings of the approach of such trains, nor to provide the instrumentalities by which such warnings shall be given. It is only when Congress has legislated under the power granted by the Constitution and regulated any particular matter pertaining to interstate commerce that the several states are prohibited from passing and enforcing laws regulating the matters mentioned.

"Under the commerce clause of the Federal Constitution there are some powers conferred on Congress which, from their very nature, may be exercised by a state until the Federal government shall legislate concerning them." Morris & Cummings v. State ex rel. Gussett, 62 Tex. 728, at page 738.

In the Morris Case it is said: "And first, whilst it is admitted that a state may, in other cases, improve the water-ways within her limits, it is urged that she cannot do so where such improvement interferes in any degree with foreign or interstate commerce. It is said that the right to regulate commerce with foreign nations and among the several states belongs exclusively to congress, and the states have no right to obstruct the same by the imposition of tolls or charges upon such commerce as may pass over the highways of transportation within her borders.

"It is true that where congress has legislated under this grant of power, and has regulated any particular matter pertaining to foreign or interstate commerce, the states have no right to interfere and pass laws which are tantamount to a regulation of the same subject. * * *

"But we are not pointed to any act of congress upon this subject whatever, and we certainly know of none which has attempted such a regulation."

In Sherlock v. Alling, 93 U. S. 99, 23 L. Ed. 819, in speaking of the power conferred upon Congress to regulate commerce, it is said: "General legislation of this kind, prescribing the liabilities or duties of citizens of a State, without distinction as to pursuit or calling, is

not open to any valid objection because it may affect persons engaged in foreign or interstate commerce. * * * In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution."

In Smith v. Alabama, 124 U. S. 465, 8 S. Ct. 564, 31 L. Ed. 508, it is said: "It is to be remembered that railroads are not natural highways of trade and commerce. They are artificial creations; they are constructed within the territorial limits of a State, and by the authority of its laws, and ordinarily by means of corporations exercising their franchises by limited grants from the State. The places where they may be located, and the plans according to which they must be constructed, are prescribed by the legislation of the State. Their operation requires the use of instruments and agencies attended with special risks and dangers, the proper management of which involves peculiar knowledge, training, skill, and care. The safety of the public in person and property demands the use of specific guards and precautions. The width of the gauge, the character of the grades, the mode of crossing streams by culverts and bridges, the kind of cuts and tunnels, the mode of crossing other highways, the placing of watchmen and signals at points of special danger, the rate of speed at stations and through villages, towns, and cities, are all matters naturally and peculiarly within the provisions of that law from the authority of which these modern highways of commerce derive their existence. The rules prescribed for their construction and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the limits of the local law. They are not per se regulations of commerce; it is only when they operate as such in the circumstances of their application, and conflict with the expressed or presumed will of congress exerted on the same subject, that they can be required to give way to the supreme authority of the Constitution."

By appellant's propositions 24 to 30, inclusive, contention is made that, since the plaintiffs applied to the State Industrial Accident Board for an award against the Gulf Casualty Company, and that said board awarded to them the sum of $7,200, to be paid in weekly installments, and since the Casualty Company has not complied with all the requirements of articles 4671 to 4677, the death statutes and the provisions of the Texas Workmen's Compensation Laws, and since the award made by the Industrial Accident Board was for a sum to be paid weekly, and was not reduced to a lump sum either by agreement or by the board, the trial court was without jurisdictional authority to adjudge to the casualty company a lump sum; that no jurisdiction is ever acquired by any court over the subject-matter of any such award, save as to the particular character of order made by the Accident Board, that is to say, whether an award for weekly compensation or for a lump sum, and then only when the action of the board has been final; therefore, as both the petition of the plaintiffs and the answer of the casualty company seek to fix the subrogation of the casualty company on the basis of a lump sum recovery for its benefit, and fails to allege that the Accident Board had made any award against the casualty company for a *lump sum award*, and failed to allege that said board had approved any agreement of the parties at interest to commute the weekly award to a lump sum, the petition, as well as the manner of the casualty company, is lacking in essential allegations to so fix the status of the casualty company as beneficiary under the death statute as to sustain a final judgment binding upon the appellees, or to give the trial court jurisdiction over the subject-matter of the compensation award, which is essential to the rendition of a final judgment that would be res adjudicata as to the claim of appellees, and particularly the minor, Ray Wells, Jr., against appellant by reason of the death of deceased; that, since the court had no jurisdiction over a portion of the subject-matter of the cause of action, and since that portion of the subject-matter is of such character as to require all matters connected therewith to be adjudicated in the trial of the cause, in order to finally adjudicate such portion of the subject-matter which the court had jurisdiction over, the court was without power or jurisdiction to render judgment in the case, and such judgment so rendered is void.

We overrule the contention. We think the court had jurisdiction of the entire subject-matter and that it correctly gave plaintiffs a judgment for the total sum of $30,000 upon the findings of the jury, and upon the agreement entered into between the plaintiffs and the casualty company, to the effect that the casualty company would accept the sum of $6,293 in settlement of its obligation to pay the award made by the Accident Board, such sum to come out of the $30,000 adjudged to the plaintiffs, and it properly rendered judgment for the casualty company for said sum, with the proviso that no recovery should be had against appellant. Under the pleadings and evidence, and upon the findings of the jury, the plaintiffs were entitled to a recovery of $30,000 to be paid in a lump sum, and it was no concern of appellant that $6,293 of the same was, by agreement of the plaintiffs and the casualty company, to be paid to said company. It was not concerned

as to whom the $30,000 which it was to pay should be paid.

■ After the award was made by the Accident Board, satisfactory to both the plaintiffs and the casualty company, the court had jurisdiction to try the suit instituted by the plaintiffs against appellant under the provisions of section 6a of article 8307,. Revised Civil Statutes of 1925, which, among other things, provides: "If compensation be claimed under this law by the injured employé or his legal beneficiaries, then the Association shall be subrogated to the rights of the injured employé in so far as may be necessary and may enforce in the name of the injured employé or of his legal beneficiaries or in its own name and for the joint use" of the injured "employé or beneficiaries and the Association the liability of said other person, and in case the Association recovers a sum greater than that paid or assumed by the Association to the employé or his legal beneficiaries, * * * then out of the sum so recovered the Association shall reimburse itself and pay said cost and the excess so recovered shall be paid to the injured employé or his beneficiaries."

■■ It is now well-settled law that, when an employee's representatives accept compensation for death under the Workmen's Compensation Statute (Rev. St. 1925, arts. 8306–8309), they are not precluded from recovering against negligent third persons, though the compensation insurance company which carried the risk refuses or fails to prosecute such suit; that the right of the insurer to be subrogated to rights of the representatives of the deceased employee is for the insurer's benefit to the extent of sums advanced to such representatives; and that any excess of any recovery had in such suit is to be for the benefit of such representatives. Galveston-Houston Electric R. Co. v. Reinle (Tex. Civ. App.) 264 S. W. 783 (writ of error refused); Hanson v. Ponder (Tex. Com. App.) 300 S. W. 35; Lancaster v. Hunter (Tex. Civ. App.) 217 S. W. 765.

By appellant's propositions 31 to 37, inclusive, it is insisted that the court erred in submitting to the jury the following issue: "Did the operatives of the locomotive, upon approaching the crossing begin ringing the bell at least 80 rods from the crossing and continue to ring the same until the crossing was reached?"

The grounds urged are that the issue was not raised by the evidence; that it appears from the evidence that there was no causal connection between the failure to ring the bell in the manner mentioned in the issue and the collision in question. We overrule the contention. We think there was sufficient evidence to raise the issue submitted.

■ By its propositions 38 to 45, inclusive, appellant insists that the court erred in submitting to the jury the following inquiry: "Did the operatives of said train on the occasion in question on approaching said dirt road crossing have the train under control?" One of the objections urged to such submission is that it was too indefinite and is not confined to any issue raised by the pleadings or the evidence.

We agree with appellant that the inquiry as made was indefinite, but in view of the findings of the jury that appellant was guilty of negligence in running its train at an excessive rate of speed under the surrounding circumstances, and was also guilty of other alleged acts of negligence, which were a proximate cause of the death of deceased, the error complained of became immaterial. We overrule the complaint made by appellant's propositions 46 to 57, inclusive, as being without merit.

By its propositions 58 to 73, inclusive, appellant makes the contention that there was no evidence showing that the crossing in question was extradangerous or extrahazardous; that the condition, location, and general physical surroundings of the crossing were not shown to be such as would demand of an ordinary prudent person the maintenance of a watchman, an electric bell signal, or wigwag signal at the same to protect persons in the exercise of ordinary care who might use the same; therefore the court erred in submitting the issue as to whether or not appellant was negligent in not having a watchman, a stationary bell signal, or a wigwag signal at said crossing, and likewise the finding of the jury that a failure to have such watchman or signals at said crossing was negligence was without evidence to support it.

■ The contention that there was no evidence showing that the crossing in question was not extradangerous and extrahazardous cannot be sustained. It was shown that the collision occurred at Missouri City, situated on the main line .of the appellant between Houston and San Antonio, and about 14 miles west of Houston; that the railroad at Missouri City runs practically east and west, and in approaching Missouri City going west it is perfectly straight for a number of' miles. Paralleling the railroad going into and through Missouri City is the Old Spanish Trail. a paved highway, passing between the railroad and the business section of Missouri City; that just west of the station and close to it a public highway crosses both the dirt highway and the railroad, practically at right angles. According· to the evidence this highway at the time deceased was killed was used constantly by the public generally. It was shown that quite a number of people lived north of the railroad tracks at this point, and that in sending their children to school, and in going to any point south of the railroad in the vicinity of the town, and in returning from school, or returning from the town. or crossing the rail tracks, the dirt road crossing the railroad was used a great deal.

It was further shown that a great amount of freight was handled in and out of Missouri City for the use and benefit of the town of Missouri City, and other points out of Missouri City on the south side of the railroad, including not only the town of Missouri City, but Blue Ridge, an oil field in which operations had been for a long while and were then being conducted by the Gulf Production Company and other large oil companies, and that such companies had quite a lot of freight in and out of Missouri City, and express and other matters, and that all of the traffic from the oil fields of the Blue Ridge territory, as well as other territories south of the city, in getting freight from the depot had to go to the railroad station at Missouri City and return therefrom by crossing said dirt road highway just west of the railroad station.

It was further shown that the defendant railroad company had arranged about the station house, and especially on the west and north sides thereof, parking space for the use of its customers and for teams and wagons and persons having business with the company, and that at and about said depot building other obstructions were present, and that all these obstructions and the depot house completely cut off the view of trains approaching from the east going west, and that such trains could not be seen by persons so situated until they had practically passed the station house and were for all practical purposes on the crossing.

It was shown that all traffic from the north crossed said crossing, and that practically all shipping from Missouri City and the territory within the county to the south tributary to Missouri City went over the crossing; that many trains passed over such crossing each day, many of which passed without stopping at the station, and most of which were fast moving through passenger and freight trains; that at least 10 trains passed over the crossing going west daily; that the one which struck and killed the deceased was a through train and was running, at the time of the collision, 50 miles per hour.

These facts, we think, were sufficient to authorize the court to submit to the jury, as it did, the several inquiries as to whether or not a person of ordinary prudence in the exercise of ordinary care would have placed a watchman at the crossing, or have installed a stationary bell or wigwag signal at the same to warn persons about to use the crossing of the approach of trains. The submission of these inquiries separately was not error.

Each of the inquiries was submitted separately and an affirmative answer to each one, supported by sufficient evidence, would support the judgment rendered, as the jury found that such failure was negligence and a proximate cause of the death of the deceased. We think the evidence is sufficient to sustain the answers of the jury relative to the issues we have next above discussed.

■ Appellant, however, complains of the submission to the jury of the following inquiry: "Would a person of ordinary prudence, in the exercise of ordinary care, under the facts as you may find them to be in this case as to the physical conditions, locations and surroundings of the crossing where deceased was killed, at that time, had installed and jointly in operation on the occasion in question a bell and wigwag at said crossing to warn persons about to use the same of the approach of said trains?" We do not think the evidence called for the submission of such inquiry. It can hardly be held that it was the duty of appellant to install and maintain both an electric bell signal and a wigwag signal at the crossing, but we think the submission of such inquiry harmless, especially so since the jury answered the same in the negative. Such inquiry certainly could not in any manner have induced the jury one way or another to make their answers to any other issue submitted.

The jury found that the operatives of the locomotive which collided with the deceased did sound that locomotive whistle at least 80 rods from the crossing as the locomotive approached it, but that they did not sound said whistle after coming within said 80 rods distance before reaching the crossing. Appellant by its propositions 74 to 81, inclusive, contends that there was no evidence, or at least not sufficient evidence, to warrant the submission of the question as to whether the whistle was sounded after the train came within 80 rods of the crossing, nor to support a finding of the jury that it was not so sounded.

■ While it seems to us that the preponderance of the evidence opposes the finding of the jury, we are not prepared to hold that there was not sufficient evidence to support its finding. We must therefore overrule appellant's contention. However, if the finding is unsupported by evidence, it becomes immaterial, in view of the affirmative findings of the jury on other issues submitted which were supported by evidence showing that appellant was guilty of negligence which was a proximate cause of the death of the deceased. The jury found that the train which collided with the automobile of the deceased was running at a speed of 50 miles an hour at the time of such collision, that under all the facts and circumstances shown it was negligence to run the train at such rate, and that such negligence was a proximate cause of the death of the deceased.

■ By its eighty-second proposition appellant insists that the evidence was insufficient to raise the issue of negligence in running the train at such speed. We overrule the contention. We think the evidence with reference to the location, condition, and physical

surroundings of the crossing, and of the speed of the train under such circumstances, raises the issue of negligence. Missouri, K. & T. R. Co. v. Luten (Tex. Civ. App.) 203 S. W. 909; Smith v. Galveston-Houston Electric R. Co. (Tex. Com. App.) 277 S. W. 104.

By its eighty-third and eighty-fourth propositions appellant insists that the court erred in refusing to give to the jury its requested charge as follows: "You are instructed as to the law of this case touching the speed of the train, that the running by defendant railway company of said train upon its track in approaching the crossing where the collision occurred was authorized by law, and that the law does not impose any rule as to the rate of the speed of said train" —because there was no allegation of negligence based upon any ordinance or statute regulating the speed of the train.

The court did not err in refusing such charge. Appellees did allege that the train was being operated at a reckless and dangerous rate of speed and that such operation, under the surrounding circumstances, was negligence and a proximate cause of the death of the deceased. While there is no statute regulating generally the speed of trains, the trial courts and juries have found that in certain cases trains were being operated over public crossings at a negligent rate of speed, and such findings have many times been upheld by our appellate courts. Missouri, K. & T. R. Co. of Texas v. Luten (Tex. Civ. App.) 203 S. W. 909; Smith v. Galveston-Houston Electric R. Co. (Tex. Com. App.) 277 S. W. 104; Lancaster v. Browder (Tex. Com. App.) 256 S. W. 905.

The court correctly refused the request of appellant to instruct the jury that the speed of the train in question was authorized by law. We do not think the charge requested, in the event of its refusal, imposed upon the trial judge the duty to give any charge in lieu of it. The evidence warranted the court in submitting the issue as to whether the speed of the train was a proximate cause of the collision, and therefore we overrule appellant's eighty-fifth proposition complaining of such submission. We also overrule the eighty-sixth to ninety-first propositions, inclusive, whereby it is contended that the finding of the jury that the operation of the train at the time, and under the circumstances, at a speed of 50 miles an hour was negligence, was unsupported by the evidence.

By its propositions 92 to 101, inclusive, appellant complains of the misconduct of Mr. Ned Morris, attorney for appellees, and insists that by reason of such misconduct it suffered injury for which the judgment should be reversed. The misconduct complained of was: That, while appellant's attorney was examining witnesses in reference to certain tests of vision toward the east, made at points near the crossing, Mr. Ned B. Morris, attorney for appellees, broke in on the examination and himself asked the witness a number of questions, and when attorney for appellant stated to him that he did not think he ought to take the witness away from him, Mr. Morris replied in the presence and hearing of the jury: "That was just a little too good a point to let get by me." Attorney for the appellant excepted to the remark, and Mr. Morris stated: "Then I will withdraw the remark." The court instructed the jury not to consider the remark as evidence.

Later, while cross-examining the engineer of the train, the witness Stevenson, and after he had proven by the witness that he had made a report of the accident, that he had neither the original nor a copy, and that witness had furnished same to counsel. Mr. Morris asked the witness the following question: "May we see the report?" To which the witness replied: "Why, I have no objection"; and upon objection on the ground that papers in the hands of attorneys for appellant were privileged, and that the asking of such question at the stage of the testimony where asked was improper, for the reason that it was for the sole purpose of implying that there was some testimony different in the statement than that of the witness himself, and that in the circumstances shown by the bill the request of the witness was improper, said Ned B. Morris withdrew the question and the answer.

Later, while cross-examining appellant's station agent at Missouri City, witness Goodwin, put on the stand by appellant, Mr. Morris while interrogating the witness upon the question of whether witness Ellis, shown by the evidence to have been at the station at the time of the collision, remained at the station, waiting for the train which collided with Mr. Wells to pass, and upon the witness, in reply to Mr. Morris' question, stating that Ellis had told witness that he had, in the presence of the jury made the remark: "That's all hearsay, but I think it is so sorry that we don't need to object to it." Upon objection to the remark by counsel for appellant, the court made this statement: "I am going to ask counsel not to make those remarks; I have had to instruct the jury so many times in reference to it—and I am going to instruct the jury not to regard it; please be careful, gentlemen, about those remarks."

And later, in his final argument to the jury, Mr. Morris, while discussing the testimony of witness J. D. Stevenson, the engineer, the portion of said testimony being a statement of the witness to the effect that as the locomotive was in close proximity to the crossing, that the automobile approached the crossing and went on the track immediately in front of the engine, and that as the automobile approached the track, he (witness) saw the deceased, Wells, in the automobile, and that Wells was looking toward him (wit-

ness), said attorney, in connection with said testimony, made this statement to the jury: "The engineer says, 'I saw him; I saw his face.' I guess he sees his face every night." Appellant objected to the remark, "I guess he sees his face every night," on the grounds that the remark was uncalled for, and improper, and inflammatory, and entirely outside of the record. The court ruled: "Sustain the objection to that argument; and the jury are instructed not to consider it"; and thereupon Mr. Morris stated: "I intended to withdraw it, anyway."

The conduct complained of is not to be commended. It was, in our opinion, improper, and should not have taken place; but we think that it is apparent that no prejudice resulted to appellant therefrom, especially in view of the fact that the court, in a courteous manner, reprimanded counsel for indulging in such conduct in the presence of the jury, thus showing his disapproval thereof to the jury, and in view of the fact that counsel withdrew his remarks complained of which took place during the examination of witnesses. We think it would be unreasonable to hold that such conduct and language could have possibly had any effect on the jury in arriving at their answers to the several issues submitted, or any one of them.

In answer to issues requested by appellant, relative to the questions of contributory negligence on the part of the deceased, the jury found, first, that the deceased did not find out whether the train was approaching the crossing before he drove his automobile upon the railway track; second, that a reasonably prudent person, situated as was the deceased, on approaching the railway crossing in an automobile, in the exercise of ordinary care, under the same or similar circumstances, would not have found out whether the train was approaching the railway crossing before driving on said crossing; and, third, that

the deceased in approaching the crossing did exercise ordinary care, such as a man of ordinary prudence would have exercised under the same or similar circumstances, to discover the approach of the train and avoid the contact therewith.

Appellant by its propositions 102 to 105, inclusive, substantially contends that the answers of the jury are unsupported by the evidence and contrary to all the evidence. Of course, appellant cannot complain of the submission of the issues to the jury as to whether the deceased was guilty of contributory negligence upon the ground that by reason of the evidence there was no such issue, or that the undisputed evidence shows that the deceased was guilty of contributory negligence as a matter of law, because it asked the submission of such issues. Having asked the submission of the issues to the jury, it is estopped to complain of their submission. Rowe v. Treude (Tex. Civ. App.) 298 S. W. 617. But if the undisputed evidence shows that deceased was guilty of negligence as a matter of law, as contended by appellant, it was not a question for the determination of the jury, but one for the decision of the court. However, after an examination of the evidence as a whole, we are not prepared to hold that the evidence showed that the deceased was guilty of contributory negligence as a matter of law.

We have examined complaints made by appellant in its propositions 106 to 112, inclusive, and we overrule them as being without merit.

By its 113th proposition appellant insists that the damages assessed by the jury are excessive. We overrule the contention. We think there was ample evidence to sustain the finding of the jury upon this issue.

For the reasons above expressed, the judgment is affirmed.

Affirmed.