EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CARMELO PAGÁN, acusado y apelante.

No. 5817.—*Sometido:* Noviembre 26, 1935. *Resuelto:* Enero 23, 1936.

*M. Acosta Velarde,* abogado del apelante; *R. A. Gómez, Fiscal* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Carmelo Pagán fué acusado de haber infringido el artículo 328 del Código Penal. De acuerdo con la acusación presentada por el Fiscal del distrito de Ponce, el referido acusado "allá en, o por uno de los días del mes de julio de 1933, y en la municipalidad de Santa Isabel, que forma parte del distrito judicial de Ponce, P. R., voluntaria e ilegalmente y en ocasión en que como maquinista guiaba una máquina del ferrocarril, lo hizo con tanta negligencia, descuido y falta de circunspección que dicha máquina chocó con una carreta de bueyes, resultando de dicho choque gravemente lesionado el ser humano Crescencio Ramos, quien falleció casi instantáneamente como consecuencia de las lesiones recibidas en el citado accidente."

Presentó la defensa una moción para que se especificara detalladamente en qué consistía la negligencia del acusado y para que se describiese el sitio en que ocurrió el accidente y se aclarasen otros hechos relacionados con el suceso. La corte de distrito declaró con lugar dicha moción en los dos primeros extremos, y el fiscal produjo entonces un pliego de especificaciones, ajustándose a la orden dictada. La defensa presentó dos excepciones perentorias, una de falta de hechos constitutivos de un delito y otra de falta de jurisdicción, siendo ambas declaradas sin lugar por la corte de distrito. Celebrado el juicio ante un jurado, el acusado fué declarado culpable y condenado a sufrir seis meses de cárcel.

Se alega en primer término que la corte inferior erró al declarar sin lugar las excepciones perentorias formuladas contra la acusación. La primera cuestión discutida en el alegato del apelante es la que se relaciona con la excepción de falta de hechos. A juicio de la defensa no se especifica ni menciona en la acusación el sitio del accidente ni se alega hecho alguno de donde surgiera una obligación legal de parte

del maquinista de observar algún cuidado o diligencia para con el interfecto Crescencio Ramos. En la acusación se dice que el accidente ocurrió en la municipalidad de Santa Isabel. El acusado pidió un pliego de especificaciones para que se describiera el sitio del accidente. El fiscal, de acuerdo con la orden de la corte inferior y accediendo a los deseos de la defensa, hace constar en su pliego de especificaciones que el accidente ocurrió en un sitio donde la vía del ferrocarril cruza con un camino privado conocido con el nombre de "Río Jueyes", del barrio Jauca Segunda del término municipal de Santa Isabel, camino que es usado por todos los trabajadores de la colonia de cañas Río Jueyes como vía de tráfico para las distintas faenas agrícolas que allí se llevan a cabo.

En el caso de *State* v. *Grossman,* 112 Atl. 892, resuelto por la Corte de Apelaciones de New Jersey, se alegó en la acusación que el acusado mantenía una casa de mala reputación en la ciudad y condado donde la ofensa fué cometida. Se sostuvo que el acusado, si deseaba una descripción más específica del lugar o sitio donde se cometió el delito, podía solicitar y conseguir su propósito por medio de un pliego de especificaciones (*bill of particulars*). En nuestro caso la defensa solicitó la relación detallada que juzgó conveniente y fué complacida. El acusado ha quedado plenamente informado y no puede alegar desconocimiento de los hechos expuestos en el pliego de especificaciones.

■■ A juicio de la defensa ha debido especificarse en qué consistió la supuesta negligencia o el supuesto descuido o la supuesta falta de circunspección que se atribuyen al acusado. Se añade que por regla general la acusación es suficiente cuando emplea el mismo lenguaje del estatuto, pero que en el presente caso no basta el uso de ese lenguaje. Se arguye que en una acusación contra un *chauffeur* basta con que se alegue que debido a la negligencia temeraria o descuido de ese *chauffeur* ocurrió un choque, porque los automóviles circulan por vías públicas y el mero hecho de circular por dichas vías establece una obligación o deber del conductor

para con el viandante, lo que no ocurre cuando se maneja una locomotora por terrenos pertenecientes a la empresa ferroviaria. En este caso, según la defensa, es necesario alegar la existencia de un cruce público o la concurrencia de hechos de donde surja un deber u obligación por parte del maquinista para con la persona que sufrió el accidente. Esta cuestión ha sido decidida por nosotros en el caso de *El Pueblo* v. *Rodríguez,* 47 D.P.R. 600, donde citamos jurisprudencia sosteniendo que cuando el acusado queda informado de la naturaleza del delito de que debe responder es innecesario alegar detalladamente en qué consiste la negligencia que se le atribuye. En *State* v. *Watson,* 216 Mo. 420, citado por nosotros con aprobación en el referido caso, se dijo lo siguiente:

"En nuestra opinión no era esencial que la acusación expusiera detalladamente en qué consistió el descuido, impericia o negligencia; y que la alegación de que guiaba y conducía este automóvil por una calle pública descuidada, aviesa y negligentemente servía para notificar al acusado de que no usaba, manejaba o conducía su automóvil de conformidad con la ley o las ordenanzas de la ciudad que reglamentan el uso y manejo de tales vehículos. Evidentemente el acusado sabía que tendría que afrontar la imputación de descuido, impericia y negligencia en el manejo de su automóvil, y al hacer frente a tal imputación es indudable que su única defensa hubiese sido que guiaba y conducía el automóvil de conformidad con las leyes y ordenanzas de la ciudad, debidamente aprobadas, para reglamentar el manejo de tales vehículos. El acusado no pudo ser inducido a error por esta alegación. A él no pudo tomársele por sorpresa. Según las alegaciones contenidas en esta acusación, él debió saber que el estado trataría de probar todos y cada uno de los hechos que tendían a establecer cualquier clase de negligencia, descuido o impericia en el manejo de ese vehículo."

En la acusación se alega que el maquinista guiaba la máquina con tanta negligencia, descuido y falta de circunspección, que dicha máquina chocó con una carreta de bueyes resultando de dicho choque gravemente lesionado el ser humano Crescencio Ramos, quien falleció casi instantáneamente a consecuencia de las lesiones recibidas. La acusación em-

plea prácticamente el lenguaje del estatuto. Es verdad que no se alega que el maquinista dejase o hiciese chocar la locomotora con la carreta de bueyes, pero se usa un lenguaje equivalente que demuestra con claridad que la negligencia, descuido y falta de circunspección en el manejo de la máquina produjeron el choque que ocasionó el accidente. Y a mayor abundamiento, en el pliego de especificaciones, producido a solicitud de la defensa, se dice que la negligencia, descuido y falta de circunspección del acusado consistió en correr la locomotora a una gran velocidad y no reducir esa velocidad al aproximarse al sitio del suceso y en no tocar pito ni campana antes de llegar al referido lugar, tocando pito casi en el momento en que chocaba la locomotora con la carreta de bueyes que conducía Crescencio Ramos.

La defensa analiza la acusación conjuntamente con el pliego de especificaciones y llega a la conclusión de que la misma no aduce hechos suficientes para imputar al acusado un delito público. Se alega que en Puerto Rico no existe estatuto penal regulando la velocidad de los trenes, que la única ley que regula esa velocidad es la núm. 70, aprobada por la Asamblea Legislativa de Puerto Rico en 1917 ( (2) pág. 449), y que dicha ley, en su artículo tercero, letra q, se refiere a las compañías de ferrocarril e impone el deber a dichas compañías de reducir la velocidad de sus trenes únicamente en los cruces de calle.

En *Pueblo* v. *Rodríguez,* supra, citamos con aprobación el caso de *Missouri, K. & T. Ry. Co. of Texas* v. *Luten,* 203 S.W. 909, resuelto por la Corte de Apelaciones Civiles de Tejas, donde se dice que aunque el sitio del accidente esté en el campo y no exista ley alguna regulando la velocidad, sin embargo, la negligencia puede ser demostrada por la velocidad a que el tren camina cuando se considere en conexión con el sitio del accidente y las circunstancias que lo rodeen.

La velocidad de un tren al aproximarse a un sitio utilizado como vía de tráfico, sin aviso de clase alguna, puede constituir negligencia. 32 C.J., pár. 1827, pág. 244; *Central of*

*Georgia R. Co.* v. *Pope,* 127 So. 835.   Todo depende del grado de velocidad, la falta de aviso, la situación del cruce y demás circunstancias que deba considerar el jurado para establecer sus conclusiones.

En el presente caso, tanto el elemento de la velocidad como la falta de aviso han sido alegados en el pliego de especificaciones, donde se dice que la locomotora caminaba a una gran velocidad, que el acusado no tocó pito ni campana antes de llegar al sitio del accidente y que el pito fué tocado casi en el momento en que chocara la locomotora con la carreta de bueyes que conducía Crescencio Ramos.   El acusado ha sido plenamente informado.   La prueba del fiscal tendió a probar estas alegaciones; la de la defensa a contradecirlas.   La controversia quedó francamente establecida y el jurado, apreciando la prueba, dictó su veredicto.   Opinamos que la acusación que sirvió de base a la prueba producida es bastante para sostener el delito imputado, y que debe desestimarse el error señalado por el acusado sobre este particular.

■ Se alega que la Corte de Distrito de Ponce carecía de jurisdicción para juzgar este caso porque la acusación ha sido presentada por el fiscal de la Corte de Distrito de Ponce, basándola en el testimonio de testigos examinados bajo juramento ante el fiscal de Guayama.   Se arguye que la ley requiere que los testigos sean examinados por el fiscal que presenta la acusación o ante un juez instructor, de acuerdo con el artículo tercero del Código de Enjuiciamiento Criminal que dice en lo pertinente así:

"Todo delito respecto del cual tuviere jurisdicción original la Corte de Distrito, deberá perseguirse en virtud de acusación presentada por el fiscal en sala de justicia y confirmada con su declaración jurada que será suficiente si en ella se expresa que la acusación se funda en las declaraciones de testigos juramentados por él o las declaraciones de testigos examinados ante un juez instructor, y que él cree solemnemente que existe justa causa para formular la acusación."

En julio de 1933, cuando ocurrieron los hechos alegados en la acusación, no había empezado a regir la Ley núm. 51 de nuestra Legislatura, que se aprobó en mayo de 1933, para entrar en vigor a los noventa días después de su aprobación. Por esta Ley se separó el distrito de Santa Isabel del distrito judicial de Guayama, quedando anexado al de Ponce. Originalmente la Corte de Distrito de Guayama tuvo jurisdicción sobre el caso. El fiscal de dicho distrito hizo la correspondiente investigación para determinar si había o no causa para procesar al acusado. En noviembre 16 de 1933, anexado ya el municipio de Santa Isabel al distrito judicial de Ponce, se formuló la acusación por el fiscal de este último distrito, basándola en el testimonio de testigos examinados bajo juramento ante el fiscal de Guayama, creyendo solemnemente que existía justa causa para presentarla al tribupal. El fiscal, de acuerdo con la ley, investiga los hechos y si existe causa probable para acusar, presenta la acusación, asumiendo prácticamente las funciones de un juez instructor. Cuando no existe gran jurado, como en el presente caso, el fiscal no sólo investiga, como pudiera hacerlo un juez instructor, sino que también presenta la acusación en el tribunal competente, basándola en declaraciones juradas. El hecho de que el fiscal de Guayama haya investigado, cuando tenía facultades para hacerlo, y que sea el fiscal de Ponce el que haya presentado la acusación, no puede tener el efecto que pretende el acusado. A nuestro juicio la acusación estuvo bien presentada y la corte adquirió jurisdicción para juzgar el caso. Debe desestimarse el error apuntado.

Los errores segundo y tercero se relacionan con la prueba. Se alega que ésta no es suficiente para establecer la culpabilidad del acusado. Sostiene la defensa que de acuerdo con el pliego de especificaciones, el ministerio fiscal estaba circunscrito a probar que el acusado fué culpable de negligencia criminal porque en los instantes en que se acercaba al cruce formado por un camino privado con una vía férrea, corría la locomotora a gran velocidad, sin reducirla

al aproximarse al sitio del suceso, y porque no tocó pito ni campana antes de llegar al referido lugar, tocando pito casi en el momento de ocurrir el choque que ocasionó la muerte de Crescencio Ramos.

El accidente ocurrió en un sitio donde la vía del ferrocarril cruza un camino privado en el término municipal de Santa Isabel. Este camino se utiliza por todos los trabajadores de la colonia de caña "Río Jueyes", como vía de tráfico para las distintas faenas agrícolas que allí se llevan a cabo. El choque se produjo en momentos en que Crescencio Ramos conducía un carro tirado por dos yuntas de bueyes y cruzaba el paso a nivel sentado en la lanza del carro. En la parte de atrás del carro iba Carlos Pérez Velázquez de pie. En el momento en que los bueyes delanteros cruzaban la vía se acercó la máquina, pitó, e inmediatamente chocó, arrastrando a Crescencio Ramos a una distancia como de 200 metros, según la prueba de la acusación. El acusado admite que la máquina paró a una distancia como de 60 metros. Carlos Pérez tuvo oportunidad, al ver que se acercaba la máquina, de tirarse del carro y salir ileso del accidente. Crescencio Ramos murió a consecuencia del mismo.

Los testigos presenciales Carlos Pérez Velázquez, Rafael Santiago, Carmelo Martínez, Pedro García y Pedro Martínez, declaran que no oyeron otro pito de la máquina que no fuera el que se tocó inmediatamente antes o casi simultáneamente con el choque. El tren no tocó pito antes de entrar en el paso a nivel, viniendo a tocarlo cuando ya estaba encima del carro de bueyes. Esta es la prueba presentada por la acusación. Hubo testigo que declaró que el tren iba "esmandao", a una velocidad tremenda, cuando ocurrió el choque. Toda la prueba del Pueblo tiende a demostrar que la máquina caminaba a bastante velocidad.

El jurado rindió un veredicto de culpabilidad. No creyó, por lo tanto, la prueba de los testigos de la defensa. Ejerció sus funciones de juzgador, apreciando la evidencia aportada

y no hay razón alguna para que esta corte altere, modifique o anule el veredicto dictado.

El conductor y el acusado declaran que el tren tocó pito en el sitio acostumbrado. El testigo de la defensa, Ramón Gelabert, ingeniero de la compañía ferroviaria, declaró que hay una señal de pito o silbato en las inmediaciones del paso a nivel, a una distancia como de 119 metros del eje de dicho paso a nivel. También existe en ese sitio un letrero que dice: "Párese—mire—oiga." Todas estas circunstancias demuestran que la compañía ferroviaria y el propio acusado tenían conocimiento de que era aquél un sitio de tráfico utilizado con alguna frecuencia.

En *Ferrer e Hijo* v. *American Railroad Co.*, 39 D.P.R. 40, 44, esta corte dijo lo siguiente:

"La distinción principal entre este caso y el de Marrero v. Am. Railroad Co., supra, es que en este último la compañía había reconocido el carácter público o cuasi público del cruce al poner letreros que leían 'Párese, mire y oiga', demostrando con ello que sabía que el público generalmente pasaba por allí. Sin embargo, no estamos preparados para decir que la demandada no tenía deber alguno, y dadas las condiciones y la opinión de la corte inferior, asumiremos, de no decidirlo, que el camino había tomado tal naturaleza que la demandada tenía algún deber para con las personas que viajaban por el mismo."

Podemos decir que hemos examinado toda la prueba practicada y nos inclinamos a creer que el jurado estuvo acertado en la apreciación de la misma. Alega el acusado que de acuerdo con la jurisprudencia el maquinista de la locomotora no tiene necesidad de tocar pito al acercarse a un cruce privado. Estas reglas no son absolutas. Hay que tener siempre en cuenta las circunstancias particulares de cada caso. La misma jurisprudencia reconoce sus excepciones. El cruce donde ocurrió el accidente se utilizaba frecuentemente por los trabajadores de la colonia "Río Jueyes" y el público tenía acceso al referido cruce. En Puerto Rico existe, ade-

más, la Ley núm. 70 de 1917, que en su artículo tercero, letra *q,* dice lo siguiente:

"Si se tratare de una compañía de ferrocarril etc., deberá instalar en sus locomotoras campanas y silbatos, que deberán usarse al acercarse a curvas, túneles y a los cruces de caminos o calles siempre que fuere necesario como advertencia de la aproximación de dichas locomotoras y trenes, los que reducirán la velocidad al mínimum en los cruces de calles."

Esta ley, a juicio de la defensa, se refiere únicamente a cruce de caminos públicos o calles. Asumiendo, sin admitirlo, que la ley sea susceptible de esta interpretación, las circunstancias que concurren en este caso, de acuerdo con la jurisprudencia, sostienen el veredicto del jurado. La prueba demuestra que la compañía y el propio acusado tenían conocimiento de que el sitio del accidente se utilizaba con frecuencia como vía de tráfico. Dentro de estas circunstancias, las personas que acostumbraban cruzar la vía tenían motivos para esperar una señal del tren al aproximarse al cruce. Se ha demostrado que cuando ocurrió el accidente había árboles y cañas alrededor de la vía, que impedían la vista considerablemente. Las cañas estaban bastante crecidas y los árboles también. Hubo prueba contradictoria en cuanto a la visibilidad del tren al penetrar una persona en el paso a nivel, pero el jurado apreció la prueba y a nuestro juicio ha quedado demostrado que la visibilidad quedaba bastante obstruída.

Hemos citado anteriormente el caso de *Ferrer e Hijo* v. *American Railroad Co.,* donde, a pesar de no tratarse de un cruce enteramente público, se resolvió que la compañía ferroviaria tenía el deber de dar algún aviso y de usar el cuidado ordinario.

En el caso de *Chesapeake & O. Ry. Co.* v. *Young's Adm'r,* 146 Ky. 317, 142 S.W. 709, 712, la Corte de Apelaciones de Kentucky se expresó así:

"Con respecto a los cruces públicos, los operadores del tren tienen el deber de anticipar la presencia de aquellas personas que pa-

sen por el camino y por esta razón el estatuto requiere que deben darse señales de la aproximación de los trenes a dichos cruces, acompañadas de una reducción de la velocidad.

"En L. & N. R. R. Co. v. Engleman's Adm'r, 135 Ky. 515, 122 S. W. 833, resolvimos en relación con el deber de las compañías ferroviarias en los cruces privados: 'La empresa puede correr sus trenes a la velocidad que le plazca sobre los cruces privados, y no se requiere que se dé noticia de la aproximación de los trenes a tales cruces, a menos que haya sido costumbre dar esas señales y que las personas que usaban el cruce confiaran en ellas. (Citas.) Por otra parte, se ha sostenido que cuando ha existido la costumbre de dar señales al aproximarse el tren a un cruce privado y las personas que utilizan el cruce confían en esas señales, una persona arrollada por el ferrocarril mientras caminaba por el cruce, por razón de la omisión de las señales requeridas, puede obtener indemnización."

En el caso de *St. Louis–San Francisco Ry. Co.* v. *Ready et al.*, 15 F (2d) 370, la Corte de Apelaciones del Quinto Circuito se expresó así:

"La única cuestión es si el demandado tiene un deber para con la persona que usa el cruce. Ready no era un intruso, sino un invitado. El tenía derecho a estar donde estaba y el deber de la compañía era darle un aviso razonable de la aproximación del tren. Evidencia de la frecuencia del uso de un cruce privado por personas ajenas a la compañía es admisible para demostrar que tal compañía tenía conocimiento y había consentido dicho uso; pero cuando, como aquí, la compañía misma establece el cruce, ella tiene conocimiento de las condiciones existentes y está obligada a usar cuidado razonable para evitar daños a las personas, sean muchas o pocas, que puedan tener ocasión de usar tal cruce."

En el caso de *Hinkle* v. *Richmond & D.R. Co.*, 109 N.C. 472, 13 S.E. 884, resuelto por la Corte Suprema de North Carolina, se dijo lo siguiente:

"En la ausencia de estatutos regulando el tiempo y manera de dar señales, la omisión de un ingeniero a cargo de una locomotora de tocar campana o pito al aproximarse al cruce de un camino público o un sitio por donde se ha permitido al público cruzar habitualmente, como la intercepción de un *mill-road* o camino vecinal frecuentemente usado, es evidencia de negligencia que debe ser sometida al jurado. (Citas.)"

En el caso de *Hartman* v. *Chicago G.W. Ry. Co.*, 132 Iowa 582, 110 N. W. 10, 11, la Corte Suprema de Iowa se expresó así:

"Se alega en el caso ante nos que de todos modos no existe evidencia de negligencia de parte del demandado y que por lo tanto un veredicto en favor del demandante no puede ser sostenido. No es ésa la conclusión que se deriva de los autos. Es verdad que el cruce donde ocurrió el accidente no era un camino público y por lo tanto si debe ser considerado simplemente como un cruce privado, el demandado no tuvo ningún deber estatutario de tocar el pito al aproximarse al sitio. (Cita.) Sin embargo, dicho demandado tenía el deber (*common-law duty*) de tener conocimiento del lugar y alrededores de sus cruces privados, y si en vista de tales circunstancias la seguridad de las personas que usasen legalmente tal cruce requería el toque de pito o campana, o el uso de otra precaución o aviso, enentonces la omisión de hacerlo así sería negligencia. Además, cuando la compañía obstruye y evita el uso del camino público, y por lo tanto, a sabiendas, desvía el tráfico a un cruce privado, en el mismo vecindario, creemos que mientras perdura este estado de cosas, el último cruce debe ser tratado como público de tal manera que requiera el uso de las señales estatutarias por los trenes que se aproximan. Además hay, como ya hemos observado, evidencia en el sentido de que la compañía demandada tenía la costumbre de observar esta precaución, y el no hacerlo en la mañana del accidente, tendía materialmente a sostener la alegación de negligencia hecha por el demandante."

Sin parar mientes en el estatuto de Puerto Rico, que obliga a las empresas ferroviarias a instalar en sus locomotoras campanas y silbatos que deberán usarse al acercarse a curvas, túneles y a los cruces de caminos o calles, la jurisprudencia citada basta para sostener el veredicto en el caso de autos. Dada la prueba practicada, tenemos que llegar a la conclusión de que tanto la compañía ferroviaria como el acusado tenían pleno conocimiento de que el cruce donde ocurrió el accidente era utilizado con alguna frecuencia como vía de tráfico.

Como cuarto motivo de error se alega que la corte trasmitió al jurado la siguiente instrucción:

"De modo que ésas son las consideraciones que el jurado debe tener en cuenta para resolver sobre la negligencia en este caso, por parte de quien la ha habido; y quiere decir la corte, repite, que no basta que Crescencio Ramos hubiera sido negligente, sino que esa negligencia tiene que haber sido de tal manera que únicamente la causa de la muerte fuera la negligencia de Crescencio Ramos, porque si no era solamente ésa la causa de la muerte, sino que también la causa de la muerte y del choque, lo fué la negligencia del maquinista del ferrocarril, él puede ser declarado culpable del choque y de la muerte de Crescencio Ramos."

No cometió el tribunal *a quo* el error que se le atribuye. En el caso de *El Pueblo* v. *Francis,* 19 D.P.R. 692, sostuvo esta corte que para que la negligencia del interfecto constituya una excusa completa y pueda eximir totalmente de responsabilidad al acusado, tiene que ser de tal naturaleza que lleve al ánimo del juzgador el convencimiento de que más que negligencia contribuyente fué la única negligencia productora del daño.

En el quinto motivo de error se alega que el tribunal *a quo* se negó a someter al jurado la siguiente instrucción:

"La corte instruye al jurado que para sostener la acusación en el presente caso y autorizar un veredicto de culpabilidad, incumbe al señor Fiscal probar un grado de negligencia por parte del acusado, mayor que la que sería necesaria para sostener una acción civil de daños y perjuicios."

Las instrucciones de la corte fueron bastante claras y correctas en relación con el grado y la clase de negligencia que debió haberse probado contra el acusado. No fué necesaria la instrucción sometida para que fuese trasmitida al jurado. La negligencia criminal es una cuestión de grado que no es susceptible de una definición precisa. No deben, por lo tanto, someterse al jurado instrucciones que, aunque se ajusten a los principios de ley, puedan crear confusión en la mente de dicho cuerpo deliberativo, especialmente cuando la corte ha dado amplias instrucciones protegiendo los derechos del acusado.

También se alega que la corte cometió error al negar la siguiente instrucción:

"No hay duda alguna de que el acusado tenía derecho a correr la locomotora que guiaba a cualquier velocidad, por no haber ley alguna reglamentando la velocidad en ese sitio y por no aparecer de la acusación, ni de la evidencia aportada al caso, hecho o circunstancia alguna que obligara al maquinista a correr a una velocidad menor que la que llevaba su locomotora inmediatamente antes del suceso."

Dadas las circunstancias que concurren en este caso, entendemos que la corte actuó correctamente al negarse a someter al jurado la instrucción anteriormente copiada.

*Debe confirmarse la sentencia apelada.*

### EN MOCION DE RECONSIDERACION

Marzo 27, 1936

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

En un extenso e interesante alegato solicita el acusado la reconsideración de nuestra sentencia, insistiendo en que la

acusación no aduce hechos bastantes para constituir un delito y en que habiendo planteado la cuestión de que el pliego de particulares suplido por el ministerio fiscal no constituye una alegación ni subsana los defectos capitales de la acusación, esta corte, sin embargo, no ha hecho pronunciamiento alguno en cuanto a este último particular, por lo cual, según el acusado, "nos encontramos en la misma situación que antes de someter el caso a la decisión final de esta Hon. Corte."

Arguye la representación del acusado que como abogado en el ejercicio activo de la profesión tiene interés en que se resuelva cuál es el efecto y consecuencia en esta Isla de Puerto Rico de un pliego de particulares suplido a una acusación que juzga insuficiente, siendo éste el motivo que le induce a solicitar se resuelva la cuestión propuesta por el apelante en su alegato original.

■ Sostiene el distinguido abogado que su alegación de que la acusación es insuficiente, bien considerada aislada o conjuntamente con el pliego de particulares, parece no haber sido entendida por esta Hon. Corte. A nuestro juicio, es el abogado quien parece no haber entendido la opinión de este tribunal, porque nosotros no estamos obligados a resolver si un pliego de particulares en una causa criminal puede considerarse o no como una enmienda a una acusación, cuando hemos llegado a la conclusión de que esa acusación aduce hechos bastantes para imputar un delito público. En la opinión que emitiéramos hemos dicho que la acusación que sirvió de base a la prueba producida es bastante para sostener el delito imputado y hemos dicho además lo siguiente, discutiendo la cuestión planteada por el acusado:

"A juicio de la defensa ha debido especificarse en qué consistió la supuesta negligencia o el supuesto descuido o la supuesta falta de circunspección que se atribuyen al acusado. Se añade que por regla general la acusación es suficiente cuando emplea el mismo lenguaje del estatuto, pero que en el presente caso no basta el uso de ese lenguaje. Se arguye que en una acusación contra un *chauffeur* basta con que se alegue que debido a la negligencia temeraria o descuido

de ese *chauffeur* ocurrió un choque, porque los automóviles circulan por vías públicas y el mero hecho de circular por dichas vías establece una obligación o deber del conductor para con el viandante, lo que no ocurre cuando se maneja la locomotora por terrenos pertenecientes a la empresa ferroviaria. En este caso, según la defensa, es necesario alegar la existencia de un cruce público o la concurrencia de hechos de donde surja un deber u obligación por parte del maquinista para con la persona que sufrió el accidente. Esta cuestión ha sido decidida por nosotros en el caso de *El Pueblo* v. *Rodríguez*, 47 D.P.R. 600, donde citamos jurisprudencia sosteniendo que cuando el acusado queda informado de la naturaleza del delito de que debe responder es innecesario alegar detalladamente en qué consiste la negligencia que se le atribuye. En *State* v. *Watson*, 216 Mo. 420, citado por nosotros con aprobación en el referido caso, se dijo lo siguiente:

" 'En nuestra opinión no era esencial que la acusación expusiera detalladamente en qué consistió el descuido, impericia o negligencia; y que la alegación de que guiaba y conducía este automóvil por una calle pública descuidada, aviesa y negligentemente servía para notificar al acusado de que no usaba, manejaba o conducía su automóvil de conformidad con la ley o las ordenanzas de la ciudad que reglamentan el uso y manejo de tales vehículos. Evidentemente el acusado sabía que tendría que afrontar la imputación de descuido, impericia y negligencia en el manejo de su automóvil, y al hacer frente a tal imputación es indudable que su única defensa hubiese sido que guiaba y conducía el automóvil de conformidad con las leyes y ordenanzas de la ciudad, debidamente aprobadas, para reglamentar el manejo de tales vehículos. El acusado no pudo ser inducido a error por esta alegación. A él no pudo tomársele por sorpresa. Según las alegaciones contenidas en esta acusación, él debió saber que el estado trataría de probar todos y cada uno de los hechos que tendían a establecer cualquier clase de negligencia, descuido o impericia en el manejo de ese vehículo.'

"En la acusación se alega que el maquinista guiaba la máquina con tanta negligencia, descuido y falta de circunspección, que dicha máquina chocó con una carreta de bueyes resultando de dicho choque gravemente lesionado el ser humano Crescencio Ramos, quien falleció casi instantáneamente a consecuencia de las lesiones recibidas. La acusación emplea prácticamente el lenguaje del estatuto. Es verdad que no se alega que el maquinista dejase o hiciese chocar la locomotora con la carreta de bueyes, pero se usa un lenguaje equivalente que demuestra con claridad que la negligencia, descuido y

falta de circunspección en el manejo de la máquina produjeron el choque que ocasionó el accidente.''

Luego de establecer estas conclusiones, dijimos que ''a mayor abundamiento'', es decir, además de las alegaciones contenidas en la acusación, ''en el pliego de especificaciones, producido a solicitud de la defensa, se dice que la negligencia, descuido y falta de circunspección del acusado consistió en correr la locomotora a una gran velocidad y no reducir esa velocidad al aproximarse al sitio del suceso y en no tocar pito ni campana antes de llegar al referido lugar, tocando pito casi en el momento en que chocaba la locomotora con la carreta de bueyes que conducía Crescencio Ramos.''

La cuestión, a nuestro juicio, ha sido resuelta. El abogado del acusado, sin embargo, nos apremia para que nosotros repudiemos la jurisprudencia establecida por este tribunal con respecto a las alegaciones que en casos de muerte criminal debe contener una acusación. Convenimos en que hay tribunales que sostienen que cuando la muerte ha sido causada por acción u omisión (*omission of duty or negligence*) todos los hechos y circunstancias esenciales para demostrar la negligencia deben ser alegados en la acusación, pero hay también tribunales que sostienen que cuando se alegan los actos en que el acusado ha estado comprometido, la acusación es suficiente sin necesidad de decir detalladamente en qué consistió la negligencia. En general una acusación es suficiente cuando informa al acusado del delito que se le imputa. Esta última teoría es, a nuestro juicio, la más acertada y justa, porque, sin ocasionar perjuicio al acusado, simplifica y facilita la administración de justicia. Ésta es la tendencia que parece predominar en las más recientes decisiones, sobre todo en aquellos estados en que las leyes de procedimiento criminal son similares o idénticas a las nuestras.

En el caso de *State* v. *Gondeiro,* 82 Mont. 530, 268 P. 507, la acusación fué excepcionada por insuficiente. En este caso

se alegó que el acusado, en 14 de agosto de 1927, en el Condado de Cascade, estado de Montana, y antes de radicarse la acusación, cometió el delito de homicidio, a saber: que el acusado voluntaria, ilegal, conocida y criminalmente dió muerte a Mary Bykari, un ser humano, contrario a la forma del estatuto, etc. Éstos fueron los únicos hechos alegados contra el acusado, quien, mientras manejaba un automóvil, mató a una persona que se hallaba en su propio carro al chocar con otro carro que caminaba en dirección opuesta. El Tribunal Supremo de Montana, en una interesante y laboriosa opinión, sostuvo que la acusación era suficiente. Copiamos a continuación algunos de los fundamentos en que se basa dicho tribunal para sostener la acusación:

"Toda persona versada en leyes sabe que de acuerdo con las antiguas leyes de Inglaterra el campo de un acusado para ejercitar su defensa estaba grandemente limitado. Debido a esta limitación, para proteger al acusado se estableció el sistema de alegaciones criminales del derecho común bajo el cual se consideraba necesario alegar el delito imputado con la mayor particularidad. Este sistema condujo al absurdo. La razón dada para establecerlo fué que el acusado debía ser completamente informado de la causa con el fin de que pudiese preparar su defensa. Aprovechándose de estos tecnicismos autorizados por la ley, el criminal con demasiada frecuencia escapaba la acción de la justicia, abusado de las reglas adoptadas para su protección y convirtiendo la administración de la ley poco menos que en un escándalo público. Durante centurias este sistema ayudó a los criminales a evadir la responsabilidad criminal, con detrimento de la ley, sin ofrecer ninguna ayuda a la administración de justicia. Poniendo de relieve el mal apuntado, dice la Corte Suprema de California en People v. King, 27 Cal. 507, 87 Am. Dec. 95: 'Bajo el pretexto de informar al acusado de la naturaleza del cargo de que debía defenderse fué necesario, de acuerdo con el derecho común, describir los medios mediante los cuales se cometió el homicidio, y la naturaleza y extensión de la herida y el sitio exacto de la misma. Como consecuencia necesaria de este requisito una ligera variante entre la prueba y la alegación frecuentemente impedía una convicción, no importa cuán manifiesta fuese la culpabilidad del acusado.

" 'Para remediar este mal el Parlamento inglés hace más de 75 años aprobó una "Ley para mejorar la administración de justicia en

la rama criminal.'' El artículo 4 de la misma disponía que en una acusación por asesinato u homicidio no sería necesario especificar la manera en que ocurrió la muerte o los medios que la causaron, siendo suficiente alegar en una acusación por asesinato que el acusado criminal y voluntariamente, y con malicia premeditada, dió muerte y asesinó al interfecto, y bastando en una acusación por homicidio alegar que el acusado mató criminalmente al interfecto.' (14 & 15 Vict., Cap. 100.) Un estatuto similar ha sido aprobado por varios de los estados de la unión. Hace más de sesenta años que la Corte Suprema de California, en el caso de *People* v. *King,* supra, dijo: 'Una tendencia a liberalizar mucho de esta antigua rigidez y severidad en procedimientos criminales se ha manifestado en la práctica moderna y en armonía con la misma la legislatura de este estado ha sustituído en lugar del viejo un nuevo sistema de práctica y procedimiento que conserva todos los elementos del primero en tanto en cuanto se hace necesario para proteger los derechos sustanciales del acusado, y descarta todos los elementos que no sirven ningún buen propósito y solamente tienden a hacer embarazosa y dificultar la administración de justicia. Este sistema prescribe algunas reglas sencillas y claras para determinar la suficiencia de las alegaciones y declara que tales reglas servirán de base para alcanzar este fin.' (Art. 235.) El artículo 235, citado en la opinión, fué incorporado en el Código Penal de California con el número 948. De California lo tomamos nosotros y aparece en los Estatutos Revisados de 1921 con el número 11841.''

El artículo citado, en vigor en California, Montana, Idaho y otros estados, tiene su equivalente en el 66 de nuestro Código de Enjuiciamiento Criminal y dice así:

"Todas las formas de alegación en acciones penales y las reglas por virtud de las cuales se determina la suficiencia de las alegaciones, son las que prescribe este código.''

La importancia de este artículo en los códigos estaduales estriba en que de acuerdo con el mismo son las reglas prescritas por el código las que deben servir de base para determinar la suficiencia de las alegaciones en las acciones penales. Estas reglas aparecen consignadas en los artículos 66, 71, 72, 75 y 82 de nuestro Código de Enjuiciamiento Criminal y en sus equivalentes de los códigos de California, Idaho y Montana. No hay para qué decir que entre nosotros no son de aplicación las antiguas reglas, por razones que re-

sultan obvias y porque debemos sujetarnos a las disposiciones del Código de Enjuiciamiento Criminal.

También la Corte Suprema de Idaho en *State* v. *Gee,* 48 Idaho 688, 248 P. 849, dice que esta disposición del estatuto contenida en el artículo 8823 de los Estatutos Compilados de dicho estado fué adoptada con el propósito de abolir la severidad del derecho común con respecto a la forma de redactar las acusaciones. Este caso de Idaho es muy interesante. Estudia y analiza los artículos 8214, 8823, 8825, 8826, 8827 y 8834 de los Estatutos Compilados del estado, equivalente el primero al artículo 203 de nuestro Código Penal y los siguientes a los artículos 66, 71, 72, 75 y 82 de nuestro Código de Enjuiciamiento Criminal. En dicho caso el acusado, que guiaba un automóvil, arrolló y dió muerte a Harry Tage. En la acusación se imputa al acusado un delito de homicidio (*manslaughter*), alegándose que:

"Charles H. Gee, de Boise, Condado de Ada, estado de Idaho, el día 9 de marzo de 1928, en Boise, Condado de Ada, estado de Idaho, allí y entonces, voluntaria, ilegal y criminalmente dió muerte al ser humano Harry Tage, todo lo cual es contrario a la ley para tal caso provista y a la paz y dignidad del estado de Idaho."

Reconoció el acusado "que las acusaciones en el estado de Idaho podían formularse usando el lenguaje del estatuto, pero alegó con énfasis que cuando el estado acusa de homicidio involuntario, basado en violaciones de un estatuto o en omisiones de actos negligentes, la acusación debe establecer la manera y los medios de la comisión del homicidio." La Corte Suprema de Idaho sostuvo la suficiencia de la acusación, expresándose en los siguientes términos:

"Puede concederse que una mayoría de los tribunales en este país, bajo el mismo o similares estatutos, sostiene la posición del apelante. Es también aparente que la tendencia moderna de las decisiones judiciales, evidenciada por las opiniones de las cortes anteriormente citadas y las opiniones de los más altos tribunales de las jurisdicciones hermanas, es hacia una forma de acusación más simple y concisa en causas criminales. (Citas.)

"El Juez Presidente Callaway, de la Corte Suprema de Montana, en una bien razonada opinión (State v. Gondeiro, 82 Mont. 530, 268 P. 507, 509), sostiene una acusación por homicidio bajo los códigos revisados de Montana, 1921, art. 10959, en un caso en que los hechos fueron algo similares a los ocurridos en el presente caso . . .

"Antes de que nuestro artículo 8214 de los Estatutos Compilados fuese enmendado en 1921, su lenguaje era idéntico al artículo 10959 de los Códigos Revisados de Montana, definiendo el homicidio, siendo ambos iguales al estatuto de California que define el mismo delito. Nuestro presente estatuto es sustancialmente igual al de Montana en la sección referida, y los artículos 11841, 11842, 11843, 11844, 11845, 11852 y 11853 de los Códigos Revisados de Montana de 1921 son prácticamente idénticos a los artículos 8823, 8824, 8825, 8826, 8827, 8834 y 8835 de nuestros Estatutos Compilados. La opinión en el caso de Montana es, por lo tanto, de una gran fuerza persuasiva.

"Si el apelante en una simple acusación de asesinato, de acuerdo con la evidencia, hubiese sido convicto de homicidio, el asesinato imputado sostendría tal convicción. (Citas.) En virtud de una acusación de homicidio voluntario, una convicción de homicidio involuntaro, bajo nuestro estatuto, ha sido sostenida. *People* v. *Pearne*, supra. Y de todos modos, si el acusado no fuese suficientemente informado por los términos de la acusación con respecto al cargo que debe rebatir, en un caso dado podría demandar un pliego de especificaciones. Aunque el derecho para hacerlo no ha sido reconocido por nuestros estatutos, esta corte ha sostenido que un acusado tendría derecho a tal pliego de especificaciones acogiéndose a la sana discreción del juzgador . . .

"La acusación sustancialmente se ajusta a los requisitos del artículo 8834 de los Estatutos Compilados y otros artículos del Código Penal a que nos hemos referido, y no parece que el apelante haya sido privado de ningún derecho sustancial al requerírsele que conteste dicha acusación."

El artículo 203 de nuestro Código Penal, que define el homicidio voluntario e involuntario, es idéntico al artículo 10959 de los Códigos Revisados de Montana, y sustancialmente igual al artículo 8214 de los Estatutos Compilados de Idaho. Y el artículo 8834 a que se refiere la Corte Suprema de Idaho en el último párrafo de la opinión que hemos copiado, es sustancialmente igual al artículo 82 de nuestro Código de Enjuiciamiento Criminal que en su inciso sexto

dice que "la acusación es suficiente si de ella se deduce que la acción u omisión considerada como delito está expuesta clara y distintamente en lenguaje corriente y conciso, sin repetición, y de tal modo que facilite a cualquier persona de inteligencia común, conocer lo que se quiere decir.''

Basta con las decisiones citadas. Creemos innecesario acudir a las decisiones de los tribunales de otros estados que sostienen la misma doctrina. En algunos de ellos se dice que es innecesario alegar el deber del acusado hacia el interfecto bajo las circunstancias y que debe sostenerse una acusación que alega hechos esenciales (*ultimate facts*), en términos generales, aunque no impute (*charge*) negligencia culpable u otro grado de negligencia *eo nomine*. Decir más sería alegar evidencia. *State.* v. *Lester,* L.R.A. (N. S.) 1915D, 201. Otras decisiones sostienen que una alegación es bastante cuando informa a un acusado que ha matado a una persona guiando un automóvil, que lo hizo de una manera ilegal, descuidada y negligente. *Madding* v. *State,* 177 S. W. 412.

El acusado, sin embargo, insiste en sostener que esta jurisprudencia no debe aplicarse en el caso de una muerte causada por la compañía ferroviaria, porque las circunstancias son distintas. Nosotros no vemos la distinción. Las disposiciones del código no autorizan que se distinga entre una acusación por homicidio establecida contra el maquinista de una locomotora y el conductor de un automóvil. Las mismas reglas deben aplicarse en ambos casos. La jurisprudencia de los tribunales que sostienen el criterio seguido por este tribunal se basa en el derecho escrito y cubre toda clase de acusaciones en que por negligencia criminal o descuido se haya privado de la vida a una persona.

Ratificando las conclusiones establecidas en nuestra opinión original, sostenemos la suficiencia de la acusación en el presente caso, donde, como ya hemos dicho, se alega que Carmelo Pagán voluntaria e ilegalmente y en ocasión en que como maquinista guiaba una máquina del ferrocarril, lo hizo con tanta negligencia, descuido y falta de circunspección, que

dicha máquina chocó con una carreta de bueyes, resultando de dicho choque gravemente lesionado el ser humano Crescencio Ramos, quien falleció casi instantáneamente como consecuencia de las lesiones recibidas en el citado accidente.

En cuanto a la cuestión planteada por el abogado sobre el pliego de especificaciones, deseamos hacer constar que la jurisprudencia sostiene que los defectos de una acusación no quedan subsanados por el hecho de que se haya presentado dicho pliego para ofrecer una información más amplia al acusado. Casi toda la jurisprudencia que hemos examinado se refiere a *indictments* y alguna a la acusación que en la nomenclatura legal americana se conoce con el nombre de *information*. Existe cierta diferencia entre aquellos cargos formulados por un gran jurado mediante *indictment* y los que se formulan por el fiscal mediante información. En el primer caso el fiscal no puede enmendar los cargos formulados por el gran jurado; en el segundo está autorizado para enmendar la acusación. ¿Puede hacerlo por medio de un pliego de especificaciones? Cuestión es ésta que no deseamos resolver en el presente caso. Es claro que el fiscal no puede, mediante un pliego de especificaciones, subsanar los defectos de un *indictment* formulando nuevos cargos, sobre los cuales no tuvo oportunidad de emitir su juicio el gran jurado. (*State* v. *Williams*, 14 Tex. 98, 129.) La cuestión varía cuando ese pliego de especificaciones se presenta en una acusación formulada por el fiscal. Hay tribunales, sin embargo, que sostienen que el pliego referido, aunque sea presentado por el fiscal en una acusación, no puede considerarse como una enmienda a la misma. (*State* v. *Long*, 129 La. 777, 156 So. 884.) Aunque la doctrina sentada por la Corte Suprema de Louisiana pueda ser correcta, en esa jurisdicción, nos abstenemos de emitir nuestro criterio sobre esta cuestión porque creemos debe resolverse cuando sea necesario hacerlo, después de un estudio detenido y una cuidadosa consideración.

Hay otros particulares tratados por el acusado en su moción de reconsideración que no creemos necesario considerar, porque no presentan ninguna cuestión nueva y no exigen, a nuestro juicio, más amplia discusión.

*No ha lugar a la reconsideración solicitada.*